ERICA J. VAN LOON (SBN 227712)
evanloon@lathropgage.com
JOSHUA J. POLLACK (SBN 215922)
jpollack@lathropgage.com
LATHROP GAGE LLP
1888 Century Park East, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 789-4600
Facsimile:  (310) 789-4601

Attorneys for Plaintiff Jiae Lee

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| JIAE LEE<br><br>        Plaintiff,<br><br>v.<br><br>DONG YEOUN LEE, a/k/a DAMON LEE; and GRACE MIN,<br><br>        Defendants | Case No. 2:19-cv-8814<br><br>**COMPLAINT FOR:**<br><br>**1. FRAUD AND INTENTIONAL DECEIT;**<br>**2. NEGLIGENT MISREPRESENTATION;**<br>**3. CONVERSION;**<br>**4. BREACH OF FIDUCIARY DUTY; AND**<br>**5. UNJUST ENRICHMENT**<br><br>**Jury Trial Demanded** |

LATHROP GAGE LLP
1888 CENTURY PARK EAST, SUITE 1000
LOS ANGELES, CA 90067

31684356

1

2       Plaintiff Jiae Lee ("Plaintiff"), through undersigned counsel, for her Complaint against

3   Defendants Dong Yeoun Lee (a/k/a Damon Lee) and Grace Min (each a "Defendant" and

4   collectively, the "Defendants"), states and alleges as follows:

5                              **PRELIMINARY STATEMENT**

6       1.      This lawsuit arises out of a fraudulent scheme carried out by Defendants Damon Lee

7   and Grace Min who made knowingly false and misleading statements and conduct to Mrs. Jiae Lee,

8   and abused her confidence and trust, to induce Mrs. Jiae Lee to give over her personal savings to

9   Defendants under the guise of a purported "investment" in a Coffee Bean franchise to be opened at

10  the Children's Hospital Los Angeles ("CHLA").

11      2.      Damon Lee is a career scam artist who holds himself out as a wealthy businessman

12  having influence over and connections with, among other things, the Coffee Bean company and

13  CHLA.  He has already been found guilty by the Superior court of the State of California for the

14  County of Los Angeles of having defrauded another individual of large sums of money using the

15  same Coffee Bean scam.

16      3.      Damon Lee's conning of victims is not limited to California.  In Korea, the Seoul

17  Central District Court, criminal division, found Damon Lee guilty of multiple counts of fraud and

18  violation of Korea's securities and exchange laws in a stock market related scam.  Notably, Damon

19  Lee was found to have misrepresented to victims that he worked with the national intelligence

20  service of the Korean government and could buy land cheaply from the government.  Damon Lee is

21  also known for his connections to former Korean president Myung-Bak Lee, who himself was

22  sentenced to 15 years imprisonment for bribery and embezzlement last year.

23      4.      Starting in 2016, Damon Lee perpetrated a scam on Mrs. Jiae Lee, the plaintiff in this

24  case.  With the help of Grace Min, a long-time friend of Mrs. Jiae Lee and also currently Damon

25  Lee's girlfriend, and Jeffrey Lee, the son of Damon Lee, Damon Lee lured Mrs. Jiae Lee into a

26  series of meetings and discussions over a purported "investment opportunity."  Mrs. Jiae Lee is not a

27  sophisticated business person and English is not her native language.

28

LATHROP GAGE LLP
1888 CENTURY PARK EAST, SUITE 1000
LOS ANGELES, CA 90067

5.      Defendants represented to Mrs. Jiae Lee that they had been authorized to put a Coffee Bean franchise at CHLA and if she invested in Defendants and their company, Mrs. Jiae Lee would be a joint owner of such franchise and thereby receive a share of profits.  But this was a scam. Defendants knew they did not have the right to open a Coffee Bean franchise at CHLA and, in fact, never intended to obtain any Coffee Bean franchise to the benefit of Mrs. Jiae Lee.  Rather, Defendants always intended to take, and did take, Mrs. Jiae Lee's money for their own personal use, benefit and enrichment.

6.      Based on Defendants' knowingly false representations, omissions and conduct, Defendants induced Mrs. Jiae Lee to hand over $600,000 to Defendants.  There is no Coffee Bean franchise at CHLA.  There are no plans to open one in the future.  Mrs. Jiae Lee has received nothing in return for her "investment."  She was a victim of a concerted pattern and practice of fraud by Defendants who simply took her money.

7.      Indeed, Defendants have admitted no investment has been made and no Coffee Bean franchise obtained.  Yet, Mrs. Jiae Lee's money has not been returned.

8.      Defendants have also continued their fraudulent conduct.  After Mrs. Jiae Lee sought return of her money, Defendants put their sham companies, Creative Global Investment, Inc. ("CGI"), CGI Gaju, LLC, and CGI Paramount, LLC (together, the "LLCs"), into Chapter 11 bankruptcy proceedings in the Central District of California.  This was done in an attempt to shield these entities from suit and judgment.  Additionally, Defendants conspired to deceive Mrs. Jiae Lee by representing that the scheduled claim filed by Grace Min was intended to protect Mrs. Jiae Lee's investment, when in fact it was a false claim designed for Damon Lee's benefit.   Damon Lee also falsely claimed that he had granted Mrs. Jiae Lee a security interest in his personal residence as further protection.

9.      Adding insult to injury, Mrs. Jiae Lee recently learned that Defendant Damon Lee filed a civil lawsuit in California state court against her, her husband and her Korean attorney as retaliation for the criminal lawsuit in Korea.  This lawsuit is frivolous and nothing but an attempt to

intimidate her, with threats and accusations against her family, into dropping her demand for return of the money taken from her by Defendants.

### PARTIES

10.     Plaintiff Jiae Lee is a citizen of South Korea and resides in Seochu-gu, Shinbanpo 270, Seoul, Korea.

11.     Upon information and belief, Defendant Dong Yeoun Lee (a/k/a Damon Lee) is a resident of California with an address of 132 Fremont Pl, Los Angeles, California 90005.

12.     Upon information and belief, Defendant Grace Min is a resident of California with an address of 5645 Bramblewood Rd, La Canada Flintage, California 91011.

### JURISDICTION AND VENUE

13.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and the parties are of diverse citizenship.  The Plaintiff is a citizen of the South Korea and each of the Defendants are citizens of California.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this judicial district.

### BACKGROUND
### A California Court Has Already Found Damon Lee Guilty
### Of Perpetrating The Same Fraudulent "Coffee Bean" Scam

15.     Damon Lee has already been judged by the court to be "an experienced and excellent 'flimflammer'" who previously defrauded another individual out of $900,000.

16.     On or about October 21, 2016, Bryan J. Song ("Mr. Song") filed suit against Damon Lee and his sham companies, CGI, CGI Gaju, and CGI Paramount, in *Bryan J. Song v. Creative Global Investment, Inc., et. al.*, Case No. BC 638221, filed in the Superior Court of the State of California for the County of Los Angeles ("Song Lawsuit").

17.     Mr. Song specifically alleged breach of contract, intentional misrepresentation, breach of fiduciary duty, and various counts under the California Corporations Code in connection

-3-

1   with a fraudulent scheme perpetrated by Damon Lee to induce Mr. Song to "invest" money into

2   nonexistent Coffee Bean franchises.

3       18.     In the Song Lawsuit, the California Superior Court found Damon Lee liable on all

4   counts presented at trial.

5       19.     On May 8, 2019, the California Superior Court entered final judgment awarding Mr.

6   Song compensatory damages of $900,000 and punitive damages of $3,000,000, plus interest in the

7   sum of $331,214.66 calculated at the rate of 10.00% per annum.

8       20.     The California Superior Court expressly found as follows:

9       The ultimate facts are that [Damon Lee], individually and using the defendant
        entities, defrauded the plaintiff and used his co-defendants, CGI and the LLCs, which
10      he had the power to manipulate and control, to assist him and [Damon Lee] also
        breached his fiduciary duties to the plaintiff in that after taking money which the
11      plaintiff entrusted to him to invest on the plaintiff's behalf in connection with the
        joint venture in which they agreed to engage, i.e., to get a Coffee Bean franchise in
12      which they would share as "partners" or equal investors (which in turn caused there to
        be investment agreements and LLC operating agreements to implement this alleged
13      goal), [Damon Lee] misused those monies for his own benefit, did not keep his
        promises to the plaintiff with regard to how plaintiff's money would be invested and
14      essentially stole the money.  [Damon Lee] further breached his duties to account to
        the plaintiff, to provide plaintiff with information and in numerous other ways
15      violated his duties and obligations to the plaintiff whose assets he held in trust, who
        he thoroughly misled by false and misleading statements which induced plaintiff
16      Song to part with his money (fraud in the inducement) and whose confidence and
        trust he abused.
17

18

19      Overall, the court has found that [Damon Lee] was an experienced and excellent
        "flimflammer" who neatly defrauded plaintiff Song.  Among other things, he also
20      falsely promised monthly income to plaintiff Song which he knew was never going to
        be received by Song, and, in pursuit of his goals including, but not limited to a goal of
21      inspiring trust and confidence in his expertise and influence in the Coffee Bean
        franchise business, [Damon Lee] pursued a phony social relationship with Song and
22      held himself out to be a very wealthy man who was the holder of many franchises
        with a Coffee Bean company in other parts of the world, worthy of trust, and who,
23      because of his relationship with that company would be able to obtain Coffee Bean
        franchises for himself and Song as equal "brothers" to enjoy and share, using a newly
24      created jointly held (Lee and Song, albeit with Lee's share held by GCI[sic]) LLC
        company for each Coffee Bean location/franchise, with these LLCs, "owned" jointly
25      by them, that would actually hold the franchise and be the franchisee, etc.

26

27      The LLC companies, purportedly, as represented to Song, to ultimately be the
        franchisees were created and Song's money was indeed put into them, albeit the
28

monetary contributions to each required to be forthcoming from Lee were never contributed or invested.  Mr. Song's monies were then taken by Lee using his own company CGI which was the designated manager of each of those companies to pay all of the expenses required to open the franchises in issue, but not for the LLCs as franchisees.  Instead, they were opened and the Song money used only for [Damon Lee's] benefit for he never caused the franchises to be "obtained" by the LLCs. Instead the franchises "went to" and were solely held and owned by [Damon Lee's] own company GCI[sic] in which Mr. Song and the LLCs held no interest.  Mr. Song was led down a yellow brick road and received nothing in return for his money, much less all that he had been promised and induced to believe he would receive if he would but contribute the money sought by [Damon Lee].

The bottom line is that plaintiff Song, as intended by [Damon Lee] at the outset, put up everything and got nothing with [Damon Lee] and his company, CGI, reaping all of the benefits of Song's over $900,000 "donation" and $50,000 "each" "finder's fees."

21.     The California Superior Court found that Mr. Song did not "invest" in the sense of having any true "investment," nor did he have any interest in a "partnership."  Mr. Song caused money to go into LLCs with the understanding based upon Damon Lee's false representations and promises, made orally and also reflected in various documents, that each of the LLCs that received his money was going to become a holder of a Coffee Bean franchise.

22.     The California Superior Court found that this was an intentionally false representation by Damon Lee.  In reality, there was no such investment project ever contemplated by Damon Lee. Damon Lee simply created and used those LLCs as fraudulent "shells" and conduits of Mr. Song's money to fund the obtaining and opening of a Coffee Bean franchise for himself in the name of his CGI company with no ownership or other interest at all, directly or indirectly, reposed in Mr. Song.

23.     Mr. Song was never given any ownership interest in the Coffee Bean franchises and Damon Lee never made his own contributions to entitle him or CGI to any membership interest at all.  Instead, Damon Lee and CGI simply used the LLCs essentially as "pocketbooks" of Damon Lee and CGI to be depleted by them to fund the opening and establishment of Coffee Bean franchises solely for Damon Lee's benefit and with nothing for Mr. Song.

24.     The California Superior Court found that Mr. Song was simply a "pigeon," not a true "investor" in the usual sense, because there was no real "investment" being proffered by Damon Lee.  Mr. Song was just a victim whose money was wrongfully obtained to be passed through the

LLC shells with the promised "investments" to acquire co-ownership of Coffee Bean franchises having been illusory from the outset.

25.     The California Superior Court found that Damon Lee knew full well that, when he induced Mr. Song to sign various agreements, Mr. Song was not able to read these documents in English.  Damon Lee admitted that he knew Mr. Song was not sophisticated and unable to understand what was going on in the various "franchise" transactions.  The California Superior Court found that Damon Lee had preyed upon Mr. Song's reliance and trust in Damon Lee and Damon Lee's false representations and "friendship."

26.     The California Superior Court found that Damon Lee, CGI, and the LLCs violated California Corporations Code section 25401 by Damon Lee's use of oral statements of untrue material facts and his knowing and intentional omissions of material facts in connection with the sale of securities to Mr. Song, including but not limited to, his representations that Mr. Song's money would end up with Mr. Song and Damon Lee holding an equal interest "like brothers" in "partnerships" that would result in them becoming the joint owners of Coffee Bean franchises, plus other statements successfully made to induce Mr. Song to part with his money but which were also material and untrue, and known by Damon Lee to be material and untrue, at the moment that they were made and at all times thereafter while Damon Lee continued to withhold and omit the true facts.

27.     The California Superior Court found that Damon Lee's conduct breached all agreements since everything set forth in each and every "agreement" and contemplated and/or set forth therein was merely part of a scheme to defraud.

28.     The California Superior Court determined that the two LLCs were nothing more than additional vehicles set up to defraud Mr. Song by Damon Lee, and as such were and are alter egos of Damon Lee who, through his company CGI, had a sole right of control of those LLCs and of their assets, even to the extent of a right to remove all of their assets and put those assets into another entity controlled by Damon Lee or to otherwise dispose of them at will.

29.     The California Superior Court also awarded Mr. Song attorney fees of $86,583 against Damon Lee.

**Defendants Perpetuated The Same Fraudulent Scheme Against Mrs. Jiae Lee**

30.     Plaintiff Jiae Lee comes from a well-respected family in Korea.  She is raising two grade-school children, a daughter and a son.  Her husband is Sung-Gu Hong, a noted doctor who manages a large orthopedic hospital in Korea.

31.     Mrs. Jiae Lee has known Defendant Grace Min since middle school, about 30 years now, and considered her to be a trusted friend.  Defendant Grace Min has known that Mrs. Jiae Lee's family is relatively wealthy and has, on occasion, borrowed money from Mrs. Jiae Lee.  They met often when Grace Min visited Korea.

32.     On September 22, 2016, Grace Min invited Mrs. Jiae Lee to meet her at the Shilla Hotel in Seoul, Korea.  She did not mention any special occasion or inform Mrs. Jiae Lee that there was any ulterior motive for the meeting.  Mrs. Jiae Lee agreed to meet with her, not knowing that the meeting was a set up.

33.     When Mrs. Jiae Lee met Grace Min at the hotel, Grace Min suddenly proposed to introduce Mrs. Jiae Lee to Damon Lee.  Grace Min regaled Mrs. Jiae Lee with stories that Damon Lee was her business partner and a highly successful entrepeneur who owned several Coffee Bean franchises in Los Angeles.  She bragged that Damon Lee made former Korean President Myung-Bak Lee a wealthy man, and had influence over and connections with many Korean and American politicians.  She represented to Mrs. Jiae Lee that Damon Lee could help her obtain a U.S. green card.

34.     Damon Lee then joined Mrs. Jiae Lee and Grace Min at the Shilla Hotel.  He represented to Mrs. Jiae Lee that he owned an investment company named "Creative Global Investment" that had the license rights to operate Coffee Bean franchises in the Los Angeles area. He also promised Mrs. Jiae Lee that she could get a green card if she were an investor in CGI.

35.     To gain Mrs. Jiae Lee's trust and allay suspicions of such a coincidental meeting, Grace Min represented that she was an investor in CGI and Coffee Bean franchises owned by CGI in Korea Town in Los Angeles.

36.     Unbeknownst to Mrs. Jiae Lee at that time, Grace Min had an arrangement with Damon Lee that she would be compensated for finding him "investors" through a "finder's fee" or some other remuneration.  On information and belief, Grace Min was additionally motivated to find new "investors" for Damon Lee's Coffee Bean scam because new cash infusions were needed to fuel the returns on her own Coffee Bean franchise investments.

37.     Grace Min invited Mrs. Jiae Lee to return to the Shilla Hotel the next morning for breakfast.

38.     On September 23, 2016, Mrs. Jiae Lee went to the Shilla Hotel and found Grace Min and Damon Lee waiting for her.

39.     Unbeknownst to Mrs. Jiae Lee, Grace Min had revealed Mrs. Jiae Lee's private family matters to Damon Lee, specifically that Mrs. Jiae Lee wanted to send her daughter to study in the United States.  To further gain Mrs. Jiae Lee's trust and confidence, Damon Lee promised Mrs. Jiae Lee that he would get her daughter admitted to the St. James School, a "prestigious" school in Los Angeles, because he personally knew the principal.  Grace Min facilitated this story by assuring Mrs. Jiae Lee that she had an acquaintance whose child got admitted to the school due to Damon Lee's help.

40.     At this meeting, Damon Lee and Grace Min represented to Mrs. Jiae Lee that there were several sites being promoted for a new Coffee Bean franchise.  Mrs. Jiae Lee expressed no interest investing because she was not interested in Coffee Bean franchises.

41.     On September 27, 2016, at the behest of and in collusion with Damon Lee, Grace Min contacted Mrs. Jiae Lee and informed her that Damon Lee had a deal with CHLA to open Coffee Bean stores in the hospital and that Mrs. Jiae Lee could acquire an ownership interest in these franchises for an investment of $500,000.  Even though Grace Min knew that Damon Lee had no

1  such contract with CHLA, she pushed Mrs. Jiae Lee to meet with Damon Lee that evening to discuss

2  details of the supposed investment.

3        42.    Trusting Grace Min, Mrs. Jiae Lee had her husband meet with Damon Lee that

4  evening, again, at the Shilla Hotel.

5        43.    Damon Lee represented that Starbucks had two stores located inside CHLA, but that

6  the lease agreements were expiring and he had a deal to replace the Starbucks with Coffee Bean

7  stores.  Defendants represented that Damon Lee and Stanley Black had persuaded CHLA to replace

8  the Starbucks stores with Coffee Bean stores.  Damon Lee represented that, Stanley Black, a well-

9  known business person and philanthropist who lives in the Los Angeles area, was an influential

10  CHLA donor and the father of the best friend of Damon Lee's son, Jeffrey Lee.

11        44.    Defendants represented that the Coffee Bean franchises inside CHLA would be

12  owned by one of Damon Lee's companies, CGI CHLA.  Damon Lee and Grace Min urged Mrs. Jiae

13  Lee to invest in Damon Lee's company.

14        45.    Specifically, Damon Lee represented that, if Mrs. Jiae Lee invested $600,000 with

15  him, she would receive a 49% ownership interest in CGI CHLA.  Damon Lee represented to Mrs.

16  Jiae Lee that the investment in and joint ownership of CGI CHLA would entitle her to receive 49%

17  of the store's profits and that her return would be $10,000 per month (just like the investment scam

18  that Damon Lee perpetrated on Mr. Song).  Damon Lee represented that CGI would own 51% of

19  CGI CHLA.  Damon Lee further represented to Mrs. Jiae Lee that the Coffee Bean stores would

20  open by February or March 2017.  To give Damon Lee's story and investment proposal credibility,

21  Grace Min told Mrs. Jiae Lee about her purported investment in CGI and Coffee Bean franchises.

22        46.    Damon Lee represented that the investment money was for the cost of interior

23  construction.  Unbeknownst to Mrs. Jiae Lee, Damon Lee and Grace Min had other plans for her

24  money.

25        47.    On information and belief, Grace Min is the owner and/or investor of Eight Korean

26  BBQ, a restaurant in Los Angeles.  Shortly after Jiae Lee paid the investment money to Damon Lee,

27  Eight Korean BBQ became one of CGI's listed food brands.

28

48.     On information and belief, Grace Min owns and operates an interior design company, called Grace Kelly Designs.  Grace Min's interior design company was set up in February 2017, shortly after Jiae Lee paid the investment money to Damon Lee, and handled the interior construction work for Damon Lee's other, personally owned Coffee Bean franchises.

49.     Mrs. Jiae Lee is not a sophisticated business person.  She was not in a position to realize that Defendants were spinning a con, and that Damon Lee in particular had no intention of investing her money to open a Coffee Bean franchise in CHLA for her benefit.  Rather, as Damon Lee had done with Mr. Song, Damon Lee and Grace Min used personal connections and "friendships" to cultivate Mrs. Jiae Lee's trust in order to defraud her of substantial sums of money. Later, Mrs. Jiae Lee would learn that Grace Min and Damon Lee were engaged in an extra-marital, intimate relationship.

50.     But because of her long relationship with Grace Min, Mrs. Jiae Lee trusted Grace Min and, based on Grace Min's urging, trusted that Damon Lee's investment proposal was a legitimate business opportunity.  Mrs. Jiae Lee tentatively agreed to sign an investment contract the next day and to make an initial down payment of $100,000 toward the investment.

51.     Although the investment contract was supposed to be between Mrs. Jiae Lee and CGI, Damon Lee insisted that the initial down payment be paid to him in cash or wired to a personal Korean bank account in his name.

52.     On September 28, 2016, the next day, Grace Min took Mrs. Jiae Lee on a golf outing with Damon Lee.  After the outing, Grace Min and Damon Lee took Mrs. Lee to the Shilla Hotel to sign the investment contract.  At the hotel, Damon Lee also showed Mrs. Lee an alleged proposal for a Coffee Bean location in CHLA.

53.     Defendants represented that the proposal had been approved by CHLA.  But to date, Damon Lee has never provided documentation of any approval for a Coffee Bean store to be opened in CHLA.  This representation was false and Defendants knew it to be false when made.

54.     Indeed, Mrs. Jiae Lee would not learn until nearly three years later that CHLA had not even issued any request for proposal nor was entertaining any vendor bids at the time.

55.     Damon Lee also showed Mrs. Jiae Lee a purported credit report listing his home in Los Angeles at a value of $8 million and a personal bank account in South Korea with a balance of approximately 30 billion Korean Won (approximately $30 million).

56.     Mrs. Jiae Lee requested that a refund clause be added to the investment contract. Damon Lee initially resisted the request saying that only an act of God could prevent a Coffee Bean store from opening in CHLA.  However, Damon Lee agreed to insert a refund clause, knowing full well that he had no intention of ever returning any funds that he received from Mrs. Jiae Lee.  The parties then executed an investment contract.

57.     The investment contract provided for Mrs. Jiae Lee to pay a total of $600,000 in a series of installments.

58.     That same day, Mrs. Jiae Lee gave Damon Lee 105,000,000 Korean Won in cash (approximately $87,500 at the prevailing exchange rate) as the initial down payment on the investment.

59.     On October 5, 2016, Damon Lee sent Mrs. Jiae Lee an email stating that he met with CHLA management on October 4, 2016.  In the email, Damon Lee represented that CHLA management had confirmed that CGI would be allowed to operate a Coffee Bean franchise in CHLA.  To date, Defendants have never provided any proof of this meeting or that CHLA management confirmed or approved that CGI would be allowed to open a Coffee Bean store in the hospital.  This representation was false and Defendants knew it to be false when made.

60.     In the October 5 email, Damon Lee instructed Mrs. Jiae Lee to make the next installment payment on her investment by wiring the funds to a private Korean bank account under the name of Shin-Chul Kang.

61.     It is not clear at this time if Shin-Chul Kang is an alias or if this account is an otherwise fraudulent account set up specifically for Damon Lee's cons.

62.     Mrs. Jiae Lee wired 466,000,000 Korean Won (approximately $390,000 at the prevailing exchange rate) to this account.

63.     On October 11, 2016, Damon Lee sent Mrs. Jiae Lee an email attaching photos supposedly taken in commemoration of the successful meeting on October 4, 2019.  In the email, Damon Lee represented that the photo depicted the vice president and management director of CHLA.  The representation that CHLA management had confirmed that CGI would be allowed to operate a Coffee Bean franchise in CHLA at an October 4, 2016 meeting was false and Defendants knew it was false when made.

64.     On October 25, 2016, Damon Lee asked Mrs. Jiae Lee to pay the next investment installment in cash by handing the funds to him at the Shilla Hotel.  Mrs. Jiae Lee handed Damon Lee 84,000,000 Korean Won (approximately $70,000 at the prevailing exchange rate).

65.     Damon Lee invited Mrs. Jiae Lee to travel to Los Angeles in December 2016.

66.     On December 22, 2016, Damon Lee took Mrs. Jiae Lee to CHLA.  In an effort to perpetuate the scam and fool Mrs. Jiae Lee into believing that Damon Lee had a done deal with CHLA, he walked her through two sites on the first floor (a Starbucks and an Aroma Café) and told her that she could choose her preferred site for the Coffee Bean store in which she was an investor. Damon Lee also gave her a tour of the Joyce and Stanley Black Family Building at CHLA. Defendants had bragged that Jeffrey Lee was close friends with Stanley Black's son.

67.     During her trip to Los Angeles, Mrs. Jiae Lee had dinner with Damon Lee and Jeffrey Lee.  Damon Lee introduced Jeffrey Lee as the person at CGI who managed the Coffee Bean franchises.  Jeffrey Lee also represented that CGI had a deal with CHLA to operate Coffee Bean stores in the hospital.

68.     On December 27, 2016, Damon Lee sent Mrs. Jiae Lee an email instructing her to wire the final investment installment to a bank account under the name of Nong-Ga, Inc. (Nong-hyup Bank 301-0149-3471-51).  On December 29, 2016, Mrs. Jiae Lee wired 30,000,000 Korean Won (approximately $25,000 at the prevailing exchange rate) to the account.

69.     It is not clear at this time if Nong-Ga, Inc. is owned by Damon Lee or otherwise a sham entity set up to facilitate Damon Lee's fraudulent schemes.

70.     Defendants led Mrs. Jiae Lee to believe that construction of the Coffee Bean store in CHLA was underway and its opening imminent.  By their representations, conduct, and omissions, Defendants led Mrs. Jiae Lee to believe that CGI CHLA had been established, Mrs. Jiae Lee was a co-owner of CGI CHLA, an agreement to open a Coffee Bean store in CHLA had been executed between CGI CHLA and CHLA, and that the Coffee Bean store would be opened by March 2017. None of these representations were true, or came to pass, and Defendants knew these representations were false and would not come to pass when made.

71.     On December 30, 2016, Damon asked Mrs. Jiae Lee to go to the Sa-Cheon city, in the Kyung-Nam province, to deliver him $10,000 in cash.  Damon Lee bragged that he knew Sung-Yong Ha, the CEO of Korea Aerospace Industries, Co. Ltd. ("KAI"), which is headquartered in Sa-Cheon and had helped KAI to lobby for a domestic helicopter development project.  He also bragged he was a lobbyist working for a KAI-Lockheed Martin consortium, which was then cooperating to bid jointly on a U.S. Advanced Pilot Training replacement project.  He also bragged about taking care of issues between Sung-Yong Ha and Michael Cohen, President Donald Trump's former personal attorney, and claimed that he would receive a large commission if the consortium won the bid.

72.     By this time, Mrs. Jiae Lee had paid Damon Lee the entire $600,000 of what she believed to be a 49% ownership investment in CGI CHLA for a Coffee Bean franchise to be located in CHLA.  In every instance, Damon Lee demanded that Mrs. Jiae Lee make the investment installment payments to him personally or to some private account, but not to CGI.

73.     By mid-January 2017, despite repeated requests for updates, Mrs. Jiae Lee had heard nothing from Damon Lee about the status of the opening of the Coffee Bean store in CHLA, even though Damon Lee had promised the Coffee Bean store would be in place no later than March 2017.

74.     Concerned about the delay, Mrs. Jiae Lee asked Damon Lee to sign a receipt acknowledging that she had already provided him with $600,000 as an investment in the Coffee Bean project at CHLA.  Damon Lee did not provide this receipt until April 23, 2017.

75.     To allay Mrs. Jiae Lee's concerns and suspicions, Damon Lee invited Mrs. Jiae Lee to a meeting at the Shilla Hotel on February 14, 2017.  At that meeting, Damon Lee represented that the management at CHLA was changing and this was causing a short delay before construction could begin.  To forestall further suspicions and string Mrs. Jiae Lee along, Damon Lee showed Mrs. Jiae Lee "blueprints" and represented that he received them from CHLA, which allegedly "proved" that he had the authorization to build the Coffee Bean stores in the hospital and that construction would start soon.  Damon assured Mrs. Jiae Lee that his deal with CHLA was set and that the Coffee Bean store, which he had previously promised would be opened by March 2017 would be in place by November 2017.  These representations were false or misleading, and Defendants knew they were false or misleading when made.

76.     Unbeknownst to Mrs. Jiae Lee, the Korean authorities had begun investigating Damon Lee for fraud.

77.     Mrs. Jiae Lee would only learn later of this criminal investigation, after having given her money to Damon Lee.

78.     During this time, Grace Min knew that Damon Lee was being investigated for fraud. But she never apprised Mrs. Jiae Lee of this fact.

79.     On August 15, 2017, Mrs. Jiae Lee notified Damon Lee that she planned to visit Los Angeles to visit the construction of the Coffee Bean store.

80.     In response, Damon Lee now claimed that more changes with CHLA management had caused further delays in the Coffee Bean construction.  But again, Damon Lee sought to forestall any suspicions about whether or not there was an agreement with CHLA.  He represented to Mrs. Jiae Lee that he was scheduled to meet with new CHLA management on August 23, 2017, to "iron out details."  These representations were false or misleading, and Defendants knew they were false or misleading when made.

81.     On September 15, 2017, having received no further updates, Mrs. Jiae Lee emailed Damon Lee requesting an update.  Damon Lee responded by representing that he had a meeting with the new vice president at CHLA, who informed him the hospital planned to renovate the entire

lobby.  Damon Lee claimed that the renovation would last through December 31, 2017, using that as an excuse for the delay to deflect any suspicions.  But, again, he assured Mrs. Jiae Lee that, despite the delays, his deal with CHLA had been confirmed by the hospital.  These representations were false or misleading, and Defendants knew they were false or misleading when made.

82.     As the November 2017 date came and went, Mrs. Jiae Lee and her husband continued to express their concerns over the delay and repeatedly inquired about the status of the construction of the Coffee Bean stores.

83.     On March 1, 2018, Damon Lee emailed Mrs. Jiae Lee.  In the email, he claimed that he had another meeting with CHLA management.  Damon Lee again represented that CHLA management confirmed that CGI CHLA would be permitted to open a Coffee Bean store in the hospital and that construction would start as soon as the lobby renovation was completed.  These representations, like the previous ones, were designed to perpetuate the false impression to Mrs. Jiae Lee that an agreement with CHLA existed and that the delays in opening the promised Coffee Bean store were merely incidental.  These representations were false or misleading, and Defendants knew they were false or misleading when made.

84.     Out of the blue, Damon Lee also told Mrs. Jiae Lee not to pay attention to any rumors that she heard about him.  Mrs. Jiae Lee had never raised her concerns to Damon Lee over the news of his criminal conviction.  She had, however, confided in Grace Min.  On information and belief, Grace Min informed Damon Lee of Mrs. Jiae Lee's concerns.

85.     On May 4, 2018, having received no further updates, Mrs. Jiae Lee emailed Damon Lee.  She requested a discussion with Damon Lee about what to do next since there was no word about the construction.

86.     On May 5, 2018, Damon Lee emailed Mrs. Jiae Lee.  In the email, he again cultivated the impression to Mrs. Jiae Lee that he had a done deal with CHLA and delays were only incidental, by representing that the Coffee Bean store was guaranteed and only delayed.  These representations were false or misleading, and Defendants knew they were false or misleading when made.

87.     Several months passed with no word from Damon Lee regarding the status of the Coffee Bean store construction, despite repeated requests for an update by Mrs. Jiae Lee and her husband.

88.     In or around October 2018, Mrs. Jiae Lee's husband sent a text message to Damon Lee.  He expressed to Damon Lee that he and Mrs. Jiae Lee did not understand the continued delay and were running out of patience.

89.     Damon Lee responded by text.  He promised that an agreement with CHLA would be concluded by no later than November 2018 and that construction would begin then.

90.     Mrs. Jiae Lee and her husband were shocked and dismayed by this response because Defendants had led her to believe, from the very first contact with Damon Lee and Grace Min, that an agreement to open the Coffee Bean store in CHLA was already in place.  This was the first time that Damon Lee let slip that an agreement with CHLA did not even exist.  Up to this point, Defendants had made it appear that an agreement with CHLA was already in place and that the only issue was the delay in starting the construction of the Coffee Bean store, not that there was even a question as to whether CGI CHLA would have the right to open a Coffee Bean franchise at CHLA.

91.     In or around November 2018, Mrs. Jiae Lee's husband asked Damon Lee to provide a copy of the promised agreement between CGI CHLA and CHLA.  Mrs. Jiae Lee and her husband would make this request repeatedly over the next several months.  Damon Lee would never provide any such agreement.

92.     In or around December 2018, Damon Lee represented to Mrs. Jiae Lee that he had communicated with CHLA management that morning, that CHLA was preparing a request for proposal ("RFP"), and that the Coffee Bean construction would finish by no later than March 2019.

93.     By this time, Damon Lee had lost track of the lies he had spun.  He again let slip that there was no deal in place, much less a formal agreement, with CHLA.  There was never even any agreement that could conceivably have been concluded by November 2018, as Damon Lee had previously represented and promised.  Instead, Damon Lee finally admitted that, at most, the hospital was preparing to issue an RFP to solicit bids for various vendors.

94.     That same month, Damon Lee sent Mrs. Jiae Lee a document listing terms and conditions that he represented as having been agreed to by CHLA.  He claimed that more details needed to be discussed with CHLA management.  However, Defendants never provided any proof that CHLA had actually agreed to these purported terms and conditions, or that Damon Lee ever had any of the discussions with CHLA that he had claimed took place, regarding the opening of a Coffee Bean store at CHLA.  These representations were false or misleading, and Defendants knew they were false or misleading when made.

95.     Damon Lee also admitted for the first time that the CGI CHLA entity, which was supposed to be co-owned by Mrs. Jiae Lee and CGI and through which the Coffee Bean franchise in CHLA would be operated, had not even been established.  This surprised Mrs. Jiae Lee because she had fully paid the $600,000 over two years earlier pursuant to the investment contract.  Up to this point, Damon Lee had led her to believe that CGI CHLA was already registered, with her as a co-owner, and that the Coffee Bean franchise license was already obtained.

96.     On December 11, 2018, Damon Lee represented that, while he had not received the "complete" contract, all the details were in progress and there was no doubt of the opening of the Coffee Bean store.

97.     On January 31, 2019, Mrs. Jiae Lee's husband again asked Damon Lee to provide the agreement that Damon Lee represented had been signed by CHLA to allow CGI CHLA to open a Coffee Bean store at the hospital.  Damon Lee did not respond and did not furnish any such agreement.

98.     On February 14, 2019, Mrs. Jiae Lee's husband repeated his request to Damon Lee for the signed agreement with CHLA.

99.     On February 16, 2019, Damon Lee claimed that he had obtained a construction permit from CHLA six months prior.  But he continued peddling the story that construction on the Coffee Bean store was still being delayed due to the renovation of the hospital lobby, all the while leading Mrs. Jiae Lee to believe that there was a done deal with CHLA.  He even went so far as to claim that a "formal agreement" had been reached between CGI and CHLA even though there was

1   no written contract.  In an effort to continue to allay Mrs. Jiae Lee's suspicions, he assured her that

2   oral commitments are legally enforceable in the United States when they are made in a formal

3   meeting.  For the first time, Damon Lee indicated that a written contract with CHLA would not be

4   entered into until around the time construction started.

5          100.    On March 20, 2019, unbeknownst to Mrs. Jiae Lee, CGI and two affiliated entities

6   filed for chapter 11 bankruptcy, presumably in response to the Song Lawsuit.  Damon Lee never

7   informed Mrs. Jiae Lee of the bankruptcy filing.  Despite the written contract between CGI and Mrs.

8   Jiae Lee, Mrs. Jiae Lee's co-interest in CGI CHLA, and the numerous communications between

9   Mrs. Jiae Lee and Damon Lee, Damon Lee failed to list Mrs. Jiae Lee as a creditor on CGI's

10  bankruptcy schedules.

11         101.    Mrs. Jiae Lee would not learn of the bankruptcy filing or the Song Lawsuit until early

12  May 2019, when she was advised of these events by her Korean counsel.

13         102.    In April 2019, Mrs. Jiae Lee and Damon Lee exchanged a series of texts.  She asked

14  him to verify that construction on the Coffee Bean store was under way.

15         103.    Damon Lee responded that the CHLA team was on a business trip and that he would

16  report back to her later.

17         104.    Later, Damon Lee admitted that construction on the Coffee Bean store in CHLA had

18  still not begun.

19         105.    On April 28, 2019, having realized that she was being "led down a yellow brick road"

20  (just as Mr. Song had been), Mrs. Jiae Lee informed Damon Lee that she wanted to cancel the

21  investment pursuant to the refund provision and asked him to return the $600,000.

22         106.    On May 13, 2019, just as he did in the scam against Mr. Song, Damon Lee refused to

23  honor Mrs. Jiae Lee's refund request.  He insisted that negotiations with CHLA were still ongoing.

24  Damon Lee also admitted that he had already spent all $600,000 of Mrs. Jiae Lee's money, even

25  though no construction of any kind had taken place, no agreement had been signed with CHLA, no

26  Coffee Bean franchise license had been obtained, and CGI CHLA had not even been formed.

27

28

107.    To date, there has been no explanation or accounting of what Mrs. Jiae Lee's money was spent on, despite repeated requests for an accounting.

108.    This is the nearly identical "Coffee Bean" scam that Damon Lee perpetrated on Mr. Song.  This time, the victim was Mrs. Jiae Lee.  In the same way he defrauded Mr. Song, Damon Lee along with Grace Min took Mrs. Jiae Lee's money for their own personal benefit as opposed to the promised investment in a Coffee Bean franchise at CHLA.

109.    When Damon Lee refused to refund her money and admitted that Defendants had spent all of her money, Mrs. Jiae Lee finally realized that she had been swindled and that all of Defendants' representations and omissions were false and misleading from the outset.  Contrary to all of the promises, representations, and assurances from Damon Lee and Grace Min, there was never any kind of agreement or understanding between CGI and CHLA to put a Coffee Bean franchise at the hospital.  Defendants never had any intention to invest Mrs. Jiae Lee's money into a Coffee Bean store at CHLA to her benefit, were never in any position to do so, and knew this all along.  Mrs. Jiae Lee did not even have any ownership interest in CGI CHLA.

110.    But Mrs. Jiae Lee's money was gone.  Defendants had taken her money, using it for their own personal benefit.  It is unclear how much of Mrs. Jiae Lee's money was split among Damon Lee, Grance Min and Jeffrey Lee, and their companies, or when Grace Min received her portion of Mrs. Jiae Lee's money from Damon Lee for her role in the scam.  However, on information and belief, Grace Min owns or has an interest, directly or indirectly, in Coffee Bean franchises that were procured by Damon Lee for or on her and his behalf subsequent to the investment contract, as well as other business interests that they now own in Koreatown, Los Angeles.

111.    On or about June 5, 2019, Mrs. Jiae Lee filed a criminal fraud complaint against Damon Lee with the Seoul South Korea District Police.

112.    On June 22, Damon Lee contacted Mrs. Jiae Lee.  He proposed to repay the $600,000 over a one year period.

113.    On July 23, 2019, having learned of the CGI bankruptcy filing, Mrs. Jiae Lee filed a proof of claim in that case for $600,000.

114.    On July 30, 2019, Damon Lee again emailed Mrs. Jiae Lee.  He condemned Mrs. Jiae Lee for having filed a criminal complaint against him in Korea.

115.    And incredibly, in an effort to continue perpetrating his scam, Damon Lee emailed Mrs. Jiae Lee on July 29, 2019, and stated that CHLA had provided CGI with an RFP for "concession solutions," that the Starbucks coffee shop which had been in the CHLA lobby for 15 years was being removed, and that the Coffee Bean franchise would be taking its place.

116.    The alleged RFP demonstrates that neither Damon Lee nor CGI ever had any authorization to put a Coffee Bean store at CHLA when such representations were made to Mrs. Jiae Lee in September 2016 and repeatedly over the next 3 years, and theere is still no authorization to do so today.

117.    Damon Lee also represented that he had "secured" Mrs. Jiae Lee's $600,000 investment with his house as guarantee of the investment.  He also said that if she still wanted to cancel the investment, despite the receipt of an RFP from CHLA, he would repay her with funds from his new investors.  Mrs. Jiae Lee was astonished by Damon Lee's brazen proposal to swindle other investors to repay her.  This was but another knowingly false or misleading representation by Damon Lee, made for the purpose of coercing Mrs. Jiae Lee into dropping her claims against Defendants in Korea.

118.    On July 31, 2019, Mrs. Jiae Lee responded to Damon Lee, through her Korean counsel.  Mrs. Jiae Lee did not believe that Damon Lee had any intention of honoring his proposal to repay her over time and demanded the immediate and full repayment of $600,000 plus interest.  Mrs. Jiae Lee did not believe that Damon Lee had taken any action to secure her investment money.  She requested that Damon Lee provide proof of the alleged security interest in his property.  To date, Damon Lee has never provided any proof of such a guarantee in Mrs. Jiae Lee's name.

119.    On August 10, 2019, Damon Lee again emailed Mrs. Jiae Lee.  In his email, Damon Lee again tried to trick Mrs. Jiae Lee into thinking she was secured by representing that he had listed

Grace Min as a creditor in the CGI bankruptcy cases in order to protect Mrs. Jiae Lee's investment. In reality, Damon Lee and Grace Min had conspired to list Grace Min as a creditor and Damon Lee confirmed that this was done at the urging of Grace Min.

120.   Damon Lee did not list Mrs. Jiae Lee as a creditor in the CGI bankruptcy case.

121.   Damon Lee has never granted Mrs. Jiae Lee a security interest in his property.

122.   Damon Lee and Grace Min conspired to submit false claims to the Bankruptcy Court so Damon Lee could improperly recoup monies from the bankruptcy proceedings through Grace Min.

## **FIRST CLAIM FOR RELIEF**
### **(Fraud and Intentional Deceit)**

123.   Plaintiff refers to and incorporates by reference the allegations contained in paragraphs 1 through 122 of this Complaint as though set forth herein in full.

124.   In September 2016, Plaintiff was introduced to Damon Lee by her longtime friend, Grace Min.  After meeting, Damon Lee represented to Plaintiff that he was the chief executive officer of CGI, an investment company that had a license to operate Coffee Bean franchises in the Los Angeles area.  Grace Min stated that she was an investor in a CGI-owned Coffee Bean store in Koreatown, Los Angeles.

125.   At a meeting on September 27, 2016, Damon Lee told Plaintiff that CHLA had agreed to replace two Starbucks' stores with two Coffee Bean stores and offered Plaintiff an opportunity to invest in one of those Coffee Bean franchises. Lee represented that he would form an entity to own the franchise named CGI CHLA and that, in exchange for an investment of $600,000, Plaintiff would receive a 49% ownership in CGI CHLA and that, once the store opened, she would receive a monthly profit of about $10,000.  CGI, according to Lee, would own 51% of CGI CHLA. Lee told Plaintiff that the store would open by March 2017.

126.   Prior to signing the September 28, 2016 contract for the purported purpose of becoming a co-owner of CGI CHLA, Plaintiff reviewed a personal credit report provided by Damon Lee.  That report showed Damon Lee owned a home in Los Angeles with a value of about $8 million

and that he had a personal bank account in South Korea with a balance of about $30 billion Kwon (approximately $30 million).

127.    Grace Min was present for both the September 27 and 28, 2016, meetings.

128.    Plaintiff is informed and believes that Damon Lee made these representations to induce Plaintiff to give him $600,000.

129.    Plaintiff is further informed and believes that Damon Lee and Grace Min knew Damon Lee's representations were false when he made them.  Upon information and belief, CHLA never told Damon Lee, Grace Min, CGI, or anyone associated with CGI that it was authorized to open a Coffee Bean franchise at CHLA.  In fact, Damon Lee has never created an entity named CGI CHLA or otherwise, to open a Coffee Bean franchise at CHLA, let alone one capitalized with the $600,000 that Plaintiff delivered to Damon Lee.  Rather, upon information and belief, Defendants used Plaintiff's money for their own personal use and benefit and not for the purpose set forth in the September 28, 2016 contract.

130.    Plaintiff trusted Damon Lee because of Plaintiff's long-term friendship with Grace Min and because he held himself out as a very wealthy and successful business man.  As such, Plaintiff reasonably and justifiably relied on Damon Lee's representations and Grace Min's personall referral, concerning Damon Lee's ability to open a Coffee Bean store at CHLA.

131.    In reliance on Damon Lee's false representations and Grace Min's personal referral, Plaintiff delivered $600,000 to Damon Lee believing these funds would be invested in CGI CHLA for the purpose of opening a Coffee Bean franchise at CHLA.

132.    In addition, since the contract was signed on September 28, 2016, Damon Lee and Grace Min have engaged in a continuing fraud against Plaintiff by making repeated and false representations and/or omissions concerning the status of the alleged Coffee Bean store at CHLA and, most recently, the false representations about scheduling claims in the LLCs Chapter 11 Bankruptcy Cases in Grace Min's name and granting Plaintiff a lien on Damon Lee's home in Grace Min's name for Plaintiff's benefit and protection.

133.    Upon information and belief, Damon Lee and Grace Min have engaged in this continuing fraud against Plaintiff to dissuade her from taking steps to recover the alleged investment that they wrongfully obtained from her.

134.    As a direct and proximate result of Damon Lee and Grace Min's intentional misrepresentations and/or omissions as alleged herein, Plaintiff has suffered damages in an amount presently estimated to be at least $600,000.

135.    The wrongful conduct of Defendants alleged herein was done with a conscious disregard of Plaintiff's rights and with the intent to vex, injure, or annoy Plaintiff, such as to constitute oppression, fraud, or malice under California Civil Code Section 3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or set an example of Defendants.

**SECOND CLAIM FOR RELIEF**

**(Negligent Misrepresentation)**

136.    Plaintiff refers to and incorporates by reference the allegations contained in paragraphs 1 through 135 of this Complaint as though set forth herein in full.

137.    At the September 27, 2016, meeting between Damon Lee, Grace Min, and Plaintiff, Damon Lee told Plaintiff he had already received authorization to put a Coffee Bean franchise at CHLA.  He further represented that, if Plaintiff would invest $600,000 in the project, the Coffee Bean store would be open by March 2017 and Plaintiff would receive a 49% share of the profits.

138.    Neither Damon Lee nor Grace Min had a reasonable basis to believe that Lee's representations about a Coffee Bean franchise at CHLA were true.  Rather, Defendants made these representations and/or omissions with the intent to induce Plaintiff's reliance thereon.

139.    Because of her long-term friendship with Grace Min and because Damon Lee held himself out to be a very wealthy and successful business man, Plaintiff justifiably relied on Defendants' representations and agreed to sign a contract to invest $600,000 in the purported Coffee Bean franchise.  Thereafter, Plaintiff delivered the $600,000 to Damon Lee.

140.     As a direct and proximate result of Damon Lee and Grace Min's negligent misrepresentations and/or omissions as alleged herein, Plaintiff has suffered damages in an amount presently estimated to be at least $600,000.

### THIRD CLAIM FOR RELIEF

### (Conversion)

141.     Plaintiff refers to and incorporates by reference the allegations contained in paragraphs 1 through 140 of this Complaint as though set forth herein in full.

142.     Plaintiff was the rightful owner of the $600,000 that she delivered to Damon Lee for the purported investment in CGI CHLA.

143.     Damon Lee received and assumed control over Plaintiff's $600,000 through his fraudulent misrepresentations and other wrongful acts alleged herein.

144.     Upon information and belief, Damon Lee and Grace Min knowingly used the $600,000 for their own benefit as opposed to using the funds to open a Coffee Bean franchise.

145.     As a direct and proximate result of Defendant's wrongful acts as alleged herein, Plaintiff has suffered damages in an amount presently estimated to be at least $600,000.

146.     The wrongful conduct of Defendants alleged herein was done with a conscious disregard of Plaintiff's rights and with the intent to vex, injure, or annoy Plaintiff, such as to constitute oppression, fraud, or malice under California Civil Code Section 3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or set an example of Defendants.

### FOURTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

147.     Plaintiff refers to and incorporates by reference the allegations contained in paragraphs 1 through 146 of this Complaint as though set forth herein in full.

148.     Plaintiff entrusted Damon Lee, in his capacity as CEO for CGI, to utilize the money she delivered to him to invest in a joint Coffee Bean venture between Plaintiff and CGI.

149.     This created a fiduciary duty on Damon Lee's part to utilize the funds for the purposes in which he was entrusted.

150.    Damon Lee breached this fiduciary duty by misusing the funds from Plaintiff for his own benefit and not for the agreed upon purposes.

151.    As a direct and proximate result of Damon Lee's breach of his fiduciary duty to Plaintiff as alleged herein, Plaintiff has suffered damages in an amount presently estimated to be at least $600,000.

152.    The aforementioned conduct by Damon Lee was motivated by oppression, fraud, and/or malice.  Therefore, Plaintiff is entitled to an award of punitive damages.

## FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment)

153.    Plaintiff refers to and incorporates by reference the allegations contained in paragraphs 1 through 152 of this Complaint as though set forth herein in full.

154.    Damon Lee and Grace Min received a benefit from Plaintiff, i.e., $600,000.

155.    Damon Lee and Grace Min failed to use the $600,000 for the purpose stated in the September 28, 2016 contract, but instead, improperly used the funds for their own use and benefit.

156.    Despite Plaintiff's demand for a return of the funds, Defendants have failed and refused to do so.

157.    As a result, Defendants have retained the benefit received from their improper use of Plaintiff's funds unjustly, all to the expense and detriment of Plaintiff.

158.    As a direct and proximate result of Grace Min and Damon Lee's actions as alleged herein, Plaintiff has suffered damages in an amount presently estimated to be at least $600,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jiae Lee prays for relief against Defendants Damon Lee and Grace Min as follows:

1.    For compensatory and general damages according to proof;

2.    For consequential, special, and incidental damages according to proof;

3.    For prejudgment interest at the maximum legal rate;

4.      For punitive and exemplary damages according to proof;

5.      For reasonable attorneys' fees and costs; and

6.      For such other and further relief as the Court may deem just and proper.

Dated:  October 14, 2019                              Respectfully submitted,

                                                     LATHROP GAGE LLP
                                                     ERICA J. VAN LOON
                                                     JOSHUA J. POLLACK

                                                     By:  /s/ Erica J. Van Loon
                                                              Erica J. Van Loon

                                                     Attorneys for Plaintiff Jiae Lee

1

**DEMAND FOR JURY TRIAL**

2          Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Jiae Lee herewith

3 demands trial by jury on all matters so triable.

4

5   Dated:  October 14, 2019                          Respectfully submitted,

6                                                     LATHROP GAGE LLP
                                                      ERICA J. VAN LOON
7                                                     JOSHUA J. POLLACK

8                                                     By:  /s/ Erica J. Van Loon
9                                                            Erica J. Van Loon

10                                                    Attorneys for Plaintiff Jiae Lee

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28