ANDREW Y. CHOUNG (SBN 203192)
andrew.choung@lathropgpm.com
ERICA J. VAN LOON (SBN 227712)
erica.vanloon@lathropgpm.com
JOSHUA J. POLLACK (SBN 215922)
joshua.pollack@lathropgpm.com
LATHROP GPM LLP
2049 Century Park East, Suite 3500
Los Angeles, CA 90067
Phone: 310.789.4600
Fax: 310.789.4601

Attorneys for Plaintiff and Counterclaim
Defendant Jiae Lee and Consolidated Defendants
Song-Gu Hong and Eun-Jeong Hwang

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION AT LOS ANGELES

| | |
|---|---|
| JIAE LEE,<br><br>                    Plaintiff,<br><br>v.<br><br>DONG YEOUN LEE, A/K/A DAMON LEE; AND GRACE MIN,<br><br>                    Defendants. | Case No. 2:19-cv-08814-JAK-PVC<br><br>*Consolidated with* 2:19-cv-9564-JAK<br><br>Hon. John A. Kronstadt<br><br>**NOTICE OF MOTION AND JIAE LEE'S MOTION TO COMPEL AND FOR SANCTIONS REGARDING DEFENDANTS' DISCOVERY VIOLATIONS AND ABUSES**<br><br>HEARING DATE:  N/A<br>TIME:          N/A<br>COURTROOM:     N/A |

LATHROP GPM LLP
2049 Century Park East, Suite 3500
Los Angeles, CA 90067

33539051

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiff Jiae Lee will and hereby does move to compel and for sanctions regarding Defendants' discovery violations and abuses.  The Court has instructed that "[t]he parties are excused from complying with the Joint Stipulation requirements under Local Rule 37 and shall proceed under Local Rule 7."  Dkt. 74 at 1.  The Court has further instructed that following the close of briefing, the Court will take the matter under submission without a hearing unless otherwise ordered.  Dkt. 74 at 2.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, pleadings of record, and such other further papers and argument as may be submitted to the Court.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on December 4, 2020.  Dkt. 74 at 1.

Dated:  December 21, 2020                    By: */s/ Joshua J. Pollack*

LATHROP GPM LLP
Andrew Y. Choung
Erica J. Van Loon
Joshua J. Pollack

*Attorneys for Plaintiff and Counterclaim Defendant Jiae Lee and Consolidated Defendants Song-Gu Hong and Eun-Jeong Hwang*

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................. 1

II.    RECORD OF ABUSIVE DISCOVERY CONDUCT ........................................ 4

    A.     By Damon Lee And CGI............................................................. 4

    B.     By Jeffrey Lee And Buja Equity ................................................. 6

    C.     As To Damon Lee's Witness, Joseph Paek ................................ 8

III.   DAMON LEE AND CGI SHOULD BE COMPELLED TO PROVIDE DISCOVERY ................................................................................. 9

    A.     Failure To Produce All Responsive Documents ........................ 9

    B.     Failure to Produce Documents Underlying Contentions ........ 12

    C.     Failure To Produce Documents Already Ordered By The Court ........... 16

    D.     Failure to Produce Properly Prepared 30(b)(6) Witness ......... 17

    E.     Refusal to Produce Witness Joseph Paek for Deposition ....... 19

    F.     Refusal to Respond to Requests for Admission ...................... 19

IV.    BUJA EQUITY SHOULD BE ORDERED TO PROVIDE DISCOVERY ...... 20

    A.     Failure To Produce Documents .............................................. 20

    B.     Failure To Produce Properly Prepared 30(B)(6) Witness ....... 22

V.     SANCTIONS FOR DISCOVERY MISCONDUCT ........................................ 22

VI.    CONCLUSION ................................................................................. 23

# TABLE OF AUTHORITIES

## Cases

*Bd. of Trustees Cal. Ironworkers Field Pension Trust v. Harrison,*
 No. 2:18-cv-4365-CBM-MRWx, 2019 WL 4565171 (C.D. Cal. Aug. 23, 2019)....20

*Cusack-Acocella v. Dual Diagnosis Treatment Ctr., Inc.*,
 No. 8:18-cv-01009-AG-KESx, 2019 WL 2621918 (C.D. Cal. Apr. 18, 2019)........19

*Davis v. Fendler*,
 650 F.2d 1154 (9th Cir. 1981)...................................................................................23

*Freeman v. San Diego Ass'n of Relators*,
 322 F.3d 1133 (9th Cir. 2003)...................................................................................23

*Hadley v. U.S.,*
 45 F.3d 1345 (9th Cir. 1995).....................................................................................20

*Hsingching Hsu v. Puma Biotech., Inc.,*
 No. 8:15–cv–00865–AG, 2018 WL 3078589 (C.D. Cal. June 20, 2018)...........17, 23

*In re Pacific Thomas Corp.,*
 715 Fed. Appx. 778 (9th Cir. 2018) ..........................................................................20

*Layton v. Intl. Ass'n of Machinists and Aerospace Workers,*
 285 Fed. Appx. 340 (9th Cir. 2008) ..........................................................................20

*Montoya v. Orange Cty. Sheriff's Dept.,*
 No. SACV 11-1922-JGB, 2013 WL 12347293 (C.D. Cal. Feb. 21, 2013) ..............19

*Oculu, LLC v. Oculus VR, Inc.,*
 No. SACV 14-0196-DOC, 2015 WL 12720305 (C.D. Cal. May 8, 2015) ........12, 16

*Performance Credit Corp. v. EMC Mortgage Corp.,*
 No. SACV07–383 DOC, 2008 WL 11343446 (C.D. Cal. Dec. 17, 2008) ...............12

*Rafael Town Center Investors, LLC v. The Weitz Company, LLC,*
 No. C 06-6633 SI, 2007 WL 2261376 (N.D. Cal. Aug. 6, 2007) .............................24

*Richmark Corp. v. Timber Falling Consultants*,
 959 F.2d 1468 (9th Cir. 1992)..............................................................................21, 23

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.,*
 No. 2:16-cv-02322-AB (SKx), 2017 WL 11489792 (C.D. Cal. Nov. 15, 2017) .....19

*Wyles v. Sussman,*
 445 F.Supp.3d 751 (C.D. Cal. 2020)........................................................................20

**Rules**

Fed. R. Civ. P. 36 ........................................................................................................ 20

Plaintiff Jiae Lee ("Prof. Lee") respectfully moves to compel discovery from and for sanctions regarding the discovery violations and abuses by Damon Lee, Jeffrey Lee, and the companies they control, Creative Global Investment, Inc. ("CGI") and Buja Equity, Ltd. ("Buja Equity").[1]

## I.   INTRODUCTION

This is not the first time that Prof. Lee has been forced to seek intervention by the Court.  The Court has already held four telephonic conferences over Defendants' discovery violations.  *See* Dkts. 44, 56 (Sep. 29, 2020); Dkts. 53, 59 (Oct. 2, 2020); Dkt. 75, 76 (Dec. 3, 2020); Dkt. 74, 77 (Dec. 4, 2020).  During this case, Damon Lee has taken every imaginable step to obstruct discovery—withholding key documents, sandbagging Prof. Lee with document productions the night before scheduled depositions, refusing to produce prepared corporate witnesses, and hiding away witnesses.[2]  Defendants have demonstrated a remarkable disdain and disregard for the Court's rules and orders, legal process, and this case.  Such egregious conduct should have consequences.

Damon Lee is the mastermind of a long-running scheme.  He sets up a web of paper companies, like CGI and Buja Equity, that purport to provide opportunities to invest in and become owners of Coffee Bean & Tea Leaf ("Coffee Bean") franchises.  But after taking the money of unsuspecting victims, Damon Lee provides nothing in return.  His victims are not invested in any Coffee Bean franchises, receive no ownership interests or monthly income, and never see their money again.

Damon Lee was already convicted in 2017 by a Korean criminal court for having defrauded investors in a massive real estate and stock market manipulation

---

[1] This is a consolidated action of claims and counterclaims by the parties.  Damon Lee is a named Defendant and Counterclaim Plaintiff.  His company, CGI, is a Counterclaim Plaintiff.  CGI and Jeffrey Lee are named defendants in Prof. Lee's amended complaint, which is pending a motion for leave (Dkt. 62).

[2] Defendant Grace Min is the subject of a separate discovery motion (Dkt. 80).

case.  Pollack Decl., Exs. 39, 40.  Here in the U.S., after a bench trial in 2019, the Los Angeles Superior Court found Damon Lee liable for having defrauded another victim, Bryan Song, using the nearly identical Coffee Bean scheme at issue in this case.  In that case, the Honorable Barbara Meiers found that the "ultimate facts are that Lee, individually and using the defendant entities, defrauded the plaintiff."

> Overall, the court has found that Mr. Lee was an experienced and excellent "flimflammer" who neatly defrauded plaintiff Song…. Mr. Song's monies were then taken by Lee using his own company CGI…. and the Song money used only for Lee's benefit…. Mr. Song was led down a yellow brick road and received nothing in return for his money, much less all that he had been promised and induced to believe he would receive if he would but contribute the money sought by Lee.

Pollack Decl., Ex. 25, *Song v. CGI et al.,* LASC Case No. BC 638221, Tentative Final Judgment and Statement of Decision at 7.

Beginning in 2016, Damon Lee perpetrated the same scam on Prof. Lee. Damon Lee lured Prof. Lee into signing an investment agreement (Dkt. 38-2 at Ex. A) with his company, CGI, and handing over $600,000 with false representations of a Coffee Bean franchise deal with the Children's Hospital Los Angeles ("CHLA"). Specifically, in September 2016, during meetings in Korea, Damon Lee falsely represented to Prof. Lee that he had an agreement in place with CHLA to open Coffee Bean stores at CHLA and she would receive an ownership stake and monthly income ($10,000 to be exact) in exchange for her investment.  Over the next few years, Damon Lee furthered his scheme by repeatedly reassuring Prof. Lee that his deal with CHLA was in place and promising that the CGI Coffee Bean store would open at CHLA.  But there was no deal with CHLA and the promised opening was only ever just around the corner.  Four years later, there is still no CGI Coffee Bean store.

Damon Lee knew his representations were false.  As CHLA confirmed in direct testimony, CHLA never had any deal with Damon Lee or CGI.  Indeed, to date, there

is still no deal between CGI and CHLA.[3]  Prof. Lee believes that, as happened with Bryan Song, Damon Lee never intended to make her an investor and shareholder.  To the contrary, he always intended to take, and did take, her money for his personal use.  As Judge Meiers had found, the web of CGI entities and affiliates is merely a façade – Damon Lee uses these entities and investors' monies as his personal cash playground.

The money trail is the key to this case.  Prof. Lee handed Damon Lee 189,000,000 Korean Won in cash while in Korea and transferred 496,000,000 Korean Won to Korean bank accounts designated by Damon Lee.[4]  Pollack Decl., Ex. 33, Korean Criminal Complaint[5] at 3-6 and Exs. 43, 46; Ex. 1, 10/09/2020 Depo. Tr. of D. Lee at 102:21-103:1, 109:17-21 (directing Prof. Lee to transfer money to the account of ShinChul Kang), 103:2-8 (directing Prof. Lee to transfer money to the account of Nonga company).  But the money trail stops cold here.  Damon Lee refuses to show where the money went.

Initially, Defendants concocted the story that Prof. Lee gave the investment money to Grace Min.  But since the evidence of record flatly contradicted this, Defendants have changed their story.  Now, Grace Min disputes that she "received" any of the investment money.  Her new story is that she only "helped transfer" the money from Korea to the U.S. for Damon Lee.  *See* Dkt. 80-1, Joint Stipulation re Plaintiff's Motion to Compel Discovery from Defendant Grace Min at 2.

But regardless of which story Defendants are telling, all the evidence that would track Prof. Lee's investment money is in their sole possession.  Yet, Damon Lee and CGI have refused to provide this discovery.  Despite contending that Prof. Lee's

---

[3] As further evidence of his fraudulent scheme, Damon Lee had his son, Jeffrey Lee, form an independent entity, Buja Equity, which is not affiliated with CGI.  Buja Equity has purportedly entered into a vendor lease agreement with CHLA, taking the very investment opportunity that was promised to Prof. Lee.

[4] This was approximately $171,000 and $429,000, respectively, at the then-current exchange rate, for a total of $600,000.

[5] Damon Lee faces detention if he returns to Korea due to the pending investigation.

money was transferred to the U.S. and into the accounts of CGI, neither Damon Lee nor CGI have proffered any evidence of what happened to the money after Damon Lee received the money in Korea.

If Damon Lee possessed evidence to substantiate his contentions, then there is no reason for him to resist discovery.  The only inference to be drawn from his refusal to provide discovery is that the withheld evidence shows Prof. Lee's money was never transferred to CGI for investment in the purported CHLA Coffee Bean deal.  Instead, Damon Lee took Prof. Lee's money for his own benefit, to pay off his business partner, ShinChul Kang, and business associates at the Nonga Company.

Damon Lee has made up his story as he goes in this case.  He uses Grace Min to take positions that cannot in any way be substantiated.  While she introduces inconsistent allegations, he obstructs discovery that would resolve the factual disputes in his stories.  But Damon Lee may not shield himself from discovery in this manner.  He had an obligation to investigate and provide discovery as to all factual bases for his contentions.  His discovery abuses and violations call for sanctions.

## II.   RECORD OF ABUSIVE DISCOVERY CONDUCT

### A.   By Damon Lee And CGI

On January 2, 2020, Prof. Lee served Damon Lee with a first set of requests for production ("First RFPs to DL").  Pollack Decl., Ex. 2.  On March 3, 2020, Damon Lee served responses to the First RFPs to DL.  *Id*., Ex. 3 ("DL's RFP Responses").  On July 15, 2020, Damon Lee served a "verification" for his March 3, 2020 RFP responses.  *Id.*, Ex. 4.  On July 16, 2020, Damon Lee served supplemental responses to Plaintiff's First RFPs to DL.  *Id.,* Ex. 5 ("DL's Supp. RFP Responses").  On October 13, 2020, Damon Lee served further supplemental responses to Plaintiff's First RFPs to DL.  *Id.,* Ex. 49 ("DL's Further Supp. RFP Responses").

On September 23 and 25, 2020, Prof. Lee served RFPs on CGI.  Pollack Decl., Ex. 6 ("First RFPs to CGI"); Ex. 7 ("Second RFPs to CGI").  CGI served its responses on October 23, 2020, *id.,* Ex. 8, and October 26, 2020, *id.,* Ex. 9, respectively.

On September 25 and 29, 2020, and before the Court on October 2, 2020, Damon Lee and CGI represented that their production of documents was complete and that they had no other responsive documents in their possession, custody, or control. Pollack Decl., ¶¶ 14-15.  CGI and Damon Lee confirmed these representations in their RFP responses.  *Id.*, Exs. 5, 8, 9, and 49.

On September 23, 2020 and October 2, 2020, CGI and Damon Lee were served with deposition notices.  *Id.*, Exs. 44 and 45.  CGI did not object to the noticed deposition topics.  *Id.*, ¶ 49.  Counsel for Jiae Lee took the depositions of Damon Lee and CGI on October 9 and 13, 2020, based on Defendants' representations.  *Id.*, ¶ 16.

These representations were false.  On October 8, 2020 at 11:01 p.m. and October 12, 2020 at 7:36 p.m., literally the nights before the depositions of Damon Lee and CGI, respectively, Defendants purported to make last-minute productions comprising hundreds of pages of documents.  Pollack Decl., ¶ 18; Exs. 13, 21.  This belied their prior representations of a complete and responsive document production. Prof. Lee's counsel were unable to assess these eve-of productions in time for the depositions.  *Id.*, ¶ 18. They are still not accessible because they were produced in an unusable format.  *Id.,* ¶ 35.

Moreover, during his October 9 and 13, 2020 depositions, individually and as CGI's Rule 30(b)(6) designee, Damon Lee revealed that he and CGI possess responsive documents that they still have not produced.  These include (1) documents that would show whether Prof. Lee's money was transferred from Korea to the U.S., Pollack Decl., Ex. 12, 10/13/2020 Depo. Tr. of D. Lee (30(b)(6)) at 104:20-105:23; (2) documents that would show whether CGI actually received Prof. Lee's investment money (an alleged memo from CGI's accounting employee), *id.*; Ex. 1, 10/09/2020 Depo. Tr. of D. Lee at 108:1-17; (3) CGI's accounting books, *id.*; Ex. 12 at 21:6-8; (5) documents that would show whether there are actually any investors and shareholders of CGI, and who they are, *id.* at 26:21-27:2; and (6) documents that would show how Prof. Lee's money was spent and if it was spent on the CHLA project.  *Id.* at 47:5-11.

To date, none of these alleged documents have been produced—either Damon Lee lied or has improperly withheld documents. *Id.* ¶ 26.

CGI also failed to comply with its obligation to provide a corporate witness who was prepared to give a meaningful Rule 30(b)(6) deposition. Damon Lee, acting as CGI's designee, admitted he did virtually nothing to prepare himself to testify on the topics in Prof. Lee's Rule 30(b)(6) deposition notice. Pollack Decl., Ex. 12 at 11:8-10, 14-16. He was unable to answer basic questions any designee should have known about CGI, such as the book value, capitalization, reorganization status, and worth of CGI; whether the CGI bankruptcy was disclosed to CHLA; his role in the reorganized CGI; his current position at CGI, who are the directors of CGI; and whether his existing Coffee Bean franchises are profitable. *Id.,* at 20:2-3, 20:11-13, 20:23-25, 21:1-5, 30:11-31:5, 31:18-21, 32:2-17, 33:18-10, 43:14-18, 43:19-44:2. These are all called for by the noticed deposition topics. *Id.*, Ex. 44 at 10-14.

On October 16, 2020, Prof. Lee served RFAs on Damon Lee and CGI. Pollack Decl., Ex. 15 ("RFAs to DL"); Ex. 16 ("RFAs to CGI"). On November 16, 2020, Damon Lee and CGI responded together that they had no obligation to answer the RFAs because they were untimely. Pollack Decl., Ex. 17 ("CGI and DL RFA Response"). Damon Lee and CGI did not deny any of the RFAs.

**B. By Jeffrey Lee And Buja Equity**

On September 22, 2020, Prof. Lee served document and deposition subpoenas on Buja Equity's counsel, who is the same as Defendants' counsel. Pollack Decl., ¶¶ 11-13; Ex. 10 ("Buja RFP Subpoena"); Ex. 11 ("Buja Depo. Subpoena"). Both subpoenas were served on Buja Equity on September 29, 2020, *id.* ¶ 13, and Prof. Lee's counsel sent Damon Lee's counsel the signed proofs of service on October 2, 2020, *id.*, ¶ 13, Ex. 30. Buja Equity did not object to the subpoenas and has never produced documents. *Id.* ¶ 13.

On October 26, 2020, Prof. Lee's counsel deposed Jeffrey Lee as Buja Equity's 30(b)(6) representative. Like CGI, Buja Equity violated its obligation to provide a

witness to give a meaningful Rule 30(b)(6) deposition.  Jeffrey Lee admitted that he did nothing to make himself knowledgeable about the topics in Prof. Lee's 30(b)(6) notice.  Pollack Decl., Ex. 14, 10/26/2020 Depo. Tr. of J. Lee at 17:20-18:7 ("[Q] <u>Did you do anything to prepare for your deposition today</u>?  A  <u>No, sir</u>.  Q  You didn't speak with anyone to prepare?  A  I spoke briefly with my attorney.  Q  Okay.  That would be Mr. Park?  A  Yes, sir?  Q  When did you speak with your attorney to prepare for this deposition?  A  <u>About 50 minutes before we logged on.</u>") (emphasis added), 18:19-25 ("Q  Did you speak with any other employees or representatives of Buja Equity to prepare for your deposition today?  A  <u>No</u>, sir.  Q  Did you review any documents to prepare for your deposition today?  A  <u>No</u>, sir.") (same).

Like his father Damon Lee, Jeffrey Lee was unable to answer even the most basic questions about the company on whose behalf he was purporting to testify.  For example, he was unable to answer any questions about the directors, officers, and employees of Buja Equity; the owners or investors in Buja Equity; who maintains Buja Equity's documents or where to find the corporate records; whether there are any records, financial, transactional, or otherwise, that show the operations of Buja Equity; CGI's equity in Buja Equity; whether Buja Equity owns/operates any Coffee Bean stores; what agreements exist with him, Damon Lee, CGI, CHLA or Coffee Bean; if Buja Equity submitted a bid to CHLA; if or when Damon Lee was ever chairman of Buja Equity; Buja Equity's bank accounts, sources of funding, and current cash holdings; whether Buja Equity has any bank accounts; how Buja Equity is paying for the construction of any alleged CHLA Coffee Bean store; whether Prof. Lee has been granted any equity interest in Buja Equity; or whether Buja Equity has ever had board meetings.  *See, id.* at 11:24-12:3, 24:17-18, 25:4-6,32:18-21, 64:14-17, 64:22-65:1, 65:2-4, 66:4-6, 70:9-11, 72:13-14, 73:24-74:1, 82:13-15, 128:19-23, 142:8-11, 146:5-7, 162:3-6, 162:7-9, 163:4-5, 163:6-7, 170:13-16, 170:25-171:3, 172:13-14, 172:15-16, 210:11-13, 210:14-16, 210:17-18, 223:12-15, 254:6-8, 254:9-10, 255:7-8, 255:9-11.  These are all called for by the noticed deposition topics.  *Id.*, Ex. 11 at 10-13.

### C. As To Damon Lee's Witness, Joseph Paek

Joseph Paek is identified in Damon Lee's Rule 26(a) initial disclosures as an "independent business development consultant" and a potential witness with discoverable information that Defendants may use to support their position, having "knowledge concerning CGI and Mr. Damon Lee's efforts in opening a Coffee Bean store at CHLA, and the progress of this Project." Pollack Decl., Ex. 20 ("DL Initial Disclosures") at 3. In fact, on December 3, 2019, Joseph Paek appeared as Damon Lee's representative, with Damon Lee's counsel, at a settlement meeting. Pollack Decl., ¶ 51. On September 15, 2020 and October 8, 2020, Prof. Lee issued a notice and amended notice of deposition subpoena, respectively, relating to Joseph Paek. Pollack Decl., Exs. 18 and 19 ("Paek Subpoena").

All attempts to serve the Paek Subpoena at the address provided by Damon Lee were unsuccessful. *Id.*, ¶ 29. According to the process server, Joseph Paek was evading service. On one occasion, the process server knocked several times at the address for service and saw a man "peek out the window." Pollack Decl., Ex. 23, Declaration of Non-Service. Another time, the process server heard "noises like a radio or television on inside the residence." *Id.* After the process server knocked several times, "the noises were turned down and all the windows were covered." *Id.*

Prof. Lee's counsel raised this issue at the October 2, 2020 teleconference with Judge Castillo. Damon Lee's counsel represented that he and Damon Lee were not in touch with Joseph Paek. They represented that they had no means to produce him for deposition, and would not accept service on his behalf. Dkt. 59, 10/02/2020 Hearing Tr. at 50:12-20 ("MR. POLLACK: Mr. Park, will you accept service of a subpoena on behalf of Mr. Paek? MR. PARK: That would be unethical of me to accept service for a witness, a third party, who hasn't even asked me to represent him, who I haven't communicated with him on [ ] the deposition…."); *see also* Pollack Decl., Ex. 22 at 2 (11/17/2020 email from D. Park to J. Pollack: "I do not have authorization to accept service of a deposition subpoena on his behalf.")

However, it was uncovered that Joseph Paek is in fact working with Damon Lee, CGI, and their counsel on this case.  The document upload metadata show that it was Joseph Paek who loaded the Defendants' last-minute October 8 and 12, 2020 document productions to the CGI document server, into document folders *controlled by Joseph Paek*.  Pollack Decl., ¶ 18; Ex. 12, 10/13/2020 Depo. Tr. of D. Lee at 149:10-152:11; Exs. 37, 38, 10/08/2020 and 10/12/2020 Box links.

When confronted with this, Damon Lee and his counsel admitted at Damon Lee's October 13, 2020 deposition: "It's true that in connection with the supplemental document production, he did assist in gathering documents together."  Pollack Decl., Ex. 12 at 153:18-20; *see also id.* at 149:16-153:25 (discussing details of Box production links maintained by Joseph Paek).

Damon Lee and CGI have still refused to accept service for or produce Mr. Paek for deposition.  Pollack Decl., Ex. 22 at 8 (11/20/2020 email from D. Park to J. Pollack) ("After consideration, we have no authority to accept service of a deposition subpoena on his behalf.")  They also refuse to stipulate that they will not rely on or call Joseph Paek at trial.  *Id.* ("We may or may not subpoena him for trial but we are not willing to drop him from our Initial Disclosures at this time.").

## III.   DAMON LEE AND CGI SHOULD BE COMPELLED TO PROVIDE DISCOVERY

### A.   Failure To Produce All Responsive Documents

Damon Lee and CGI unequivocally represented, to Prof. Lee and this Court, ahead of their scheduled depositions, that their production of documents was complete and they had no other responsive documents in their possession, custody, or control.  Pollack Decl., ¶¶ 14-15; Ex. 36, 9/27/2020 email; Dkt. 59, 10/02/2020 Hearing Tr. at 73:25-74:2, 79:19-25, 82:3, 82:15-83:5.  That representation was false.  We know it was false because Damon Lee (i) later made document dumps the nights before his depositions; (ii) admitted during his depositions that he withheld other documents; and (iii) then tried to produce documents (albeit useless, duplicative, or nonresponsive

documents) after the discovery cut-off.  *Id.*, ¶¶ 18, 35; Exs. 13, 21; Ex. 1 at 108:1-17; Ex. 12 at 21:6-8, 26:21-27:2, 47:5-11, 104:20-105:23.

For example, Damon Lee himself alleged at his October 9 and 13, 2020 depositions, both individually and as CGI's Rule 30(b)(6) designee, to have:

- Documents that would show whether Prof. Lee's money was actually transferred from Korea to the U.S.  *See id.,* Ex. 1 at 104:20-105:23 ("Q  Do you have any evidence that shows the transfer going from a Korean account to the U.S.?  A  Yes, in many peoples' name . . . . A  I'll look for it, you know, those things of transferring from Korea to here.  I'm sure there are so I'll look for them.").

- Documents that would show whether CGI ever actually received Prof. Lee's investment money (e.g., an alleged memo from CGI's accounting employee).  *See id.,* Ex. 1 at 108:1-17 ("Q   And when money comes in, such as investments, you record who those investments are from; correct?  A  There are -- when the investment money comes in, we record that it's invest money on our accounting book.  It's not a form.  It's not a big company…. A  I think there's a memo by our employees, as I recall, that, you know, when the wire comes in or checks come in from Grace Min, our accounting employee wrote down that this is – in a memo that this is investment money from Jiae Lee is what I recall.").

- Documents that would show how Prof. Lee's money was spent and whether it was actually spent on the CHLA project.  *See id.,* Ex. 12 at 47:5-11 ("[Q]  I just want to know if how you spent Jiae Lee's investment money on Paramount and Little Tokyo, I just want to know if that's recorded in documents that CGI has.  That's all I want to know.  A  I sent everything to attorney Joshua through my attorney, you know, what money we spent where.").

- CGI's accounting books.  *See id.,* Ex. 1 at 107:24-25 ("[Q]  Sir, does CGI have accounting books?  A  Of course it does."); 109:6-13 ("Q  Okay.  So sir, I don't know if it's because you don't understand the basic concepts of accounting and records, but my question is simply, I'm just looking for a piece of paper that exists in your normal CGI accounting books that has the name of Jiae Lee and the amount of her investment.  Does such a document exist?  A  <u>Yes</u>, I'll look for it.")

- Documents showing the purported investors and shareholders of CGI.  *See id.,* Ex. 12 at 26:21-27:2 ("[Q] Ignoring your reorganization plans, with respect to your currently existing documents, do you have any documents that show the

investors and shareholders of CGI?  A  <u>Yes</u>.  All the documents are at my attorney's office who deals with bankruptcy 11.") (emphasis added), 27:16-21 ("Q  Aside from income tax documents, are there any other documents that show the shareholders and investors of CGI?  A  As I recall, those are all recorded – perhaps recorded in what's called corporate kit in each company, as I recall.").

These categories of documents are all responsive to Prof. Lee's RFPs.  Pollack Decl., Ex. 2, First RFPs to DL at, *e.g.,* RFP Nos. 1-13, 27-37; Ex. 6, First RFPs to CGI, at, *e.g.*, RFP Nos. 1-12.  But none of these documents had been produced when Damon Lee and CGI represented their production was complete, and none of these documents have been produced since the depositions, whether before or after the discovery cut-off.  Pollack Decl., ¶ 26.

Since Damon Lee has confirmed these documents exist, but refuses to produce them, there is only one conclusion for his obstruction of discovery—they disprove the allegations and contentions that he has made in his defense of this case.  Specifically, these documents must show that Prof. Lee's money was never transferred to the U.S., never reached CGI, and was never used for the CHLA project.  Instead, Damon Lee used her money for his own personal benefit.

Either these damaging documents exist, or Damon Lee has lied, yet again, and CGI is nothing but a front for Damon Lee's fraudulent schemes.  After all, Damon Lee contends that CGI is a legitimate corporation, with a business address, Pollack Decl., Ex. 12 at 8:25-9:7 (CGI address), and pays income taxes, *id*. 27:8-15.  CGI contends it is the parent company of five DBA subsidiaries and has officers and shareholders.  *Id.,* Ex. 27, CGI's Responses to Prof. Lee's Interrogatories at 19-20, 28.  Taking that contention at face value, CGI surely must possess corporate records and paperwork of the type that any legitimate corporation would maintain.[6]  CGI has produced none of these types of documents.

---

[6] These would include business formation, structuring, and operating agreements; business permits, licenses, and renewals; tax licenses and renewals; articles of incorporation and corporate bylaws; meeting minutes; board resolutions; shareholder

Damon Lee and CGI should be compelled to produce all responsive documents in their possession, custody, and control that have not yet been produced as detailed in the foregoing, including documents tracing the movement and use of Prof. Lee's investment money.  If they do not, despite Damon Lee's insistence that such documents exist, then the only appropriate relief at this juncture of the case is an adverse inference that Damon Lee used Prof. Lee's investment money for his personal gain.  *See, e.g., Oculu, LLC v. Oculus VR, Inc.,* No. SACV 14-0196-DOC (JPRx), 2015 WL 12720305, at *9 (C.D. Cal. May 8, 2015) (Rosenbluth, J.) (unjustified failure to produce entitled moving party to adverse inference under Rule 37(b)).

## B. Failure to Produce Documents Underlying Contentions

Litigants are required to produce evidence to substantiate contentions that they have made or risk exclusion at trial.  *See, e.g., Performance Credit Corp. v. EMC Mortgage Corp.,* No. SACV07–383 DOC (RNBx), 2008 WL 11343446, at *3 (C.D. Cal. Dec. 17, 2008) (Carter, J.) ("IF Defendants/Responding Parties do have knowledge of other documents that support their contention . . . , the documents must produce at this time or risk exclusionary orders at the time of trial.").  Damon Lee and CGI, however, have not.  For example, in response to Prof. Lee's allegations, Damon Lee admits that CGI redirected Prof. Lee's $600,000 investment from the CHLA project to other Coffee Bean franchises that *he* owns:

> [T]he investment money was put into two other potential projects for CGI and Ms. Jiae Lee, in the event that the contemplated project with the CHLA does not get approved by the CHLA.

---

agreements and certificates; governmental compliance and regulatory documents; business reports such as quarterly or annual reports; financial and accounting records, including balance sheets and profit and loss statements; bank account and credit card statements; loan agreements; transaction documents such as purchase agreements, order forms, receipts, and invoices; corporate guarantees; debt obligations; employer-employee agreements; client lists; business liability insurance documents; commercial lease agreements; and documents relating to intellectual property such as trademarks.

Pollack Decl., Ex. 49, Defendant Dong Yeoun Lee's Supplemental Response to Plaintiff Jiae Lee's Special Interrogatory No. 4 at 3.  Damon Lee has not produced documents to evidence these contentions.  Prof. Lee's RFPs call for any allegedly corroborating documents.  Pollack Decl., Ex. 2 at, *e.g.*, RFP 1.

Damon Lee alleges $400,000 of Prof. Lee's money went toward construction of a Coffee Bean in Paramount, and $200,000 went toward one in Little Tokyo:

> Of the $600,000 allocated for the CBTL brand project between A and B, pursuant to the agreement, approximately $400,000 was used for the Paramount location construction, and approximately $200,000 was used for the Little Tokyo location.

Pollack Decl., Ex. 49 at 3; *see also id.*, Ex. 12, 10/13/2020 Depo. Tr. of D. Lee at 45:4-8 ("Q  Sir, you previously testified that you spent Jiae Lee's investment money on the CGI Paramount and Little Tokyo Coffee Beans.  Do you remember that?  A. Yes.").  If these allegations were truly credible and made in good faith, Damon Lee and CGI must have corporate records that show Prof. Lee's money did indeed go toward these "two other potential projects."  Yet, again, Damon Lee and CGI have not produced documentation to support these contentions.

Damon Lee also admits that he had Prof. Lee transfer money to the Korean bank account of an individual named ShinChul Kang.

> Q  You instructed Ms. Lee to transfer money to a person named Kang Shin Chul; correct?
>
> A  No, it's not that I instructed her to wire transfer to Kang Shin Chul, but Lee, Jiae asked me "How I can send the money?"  <u>So I told her to send it to Kang Shin Chul's account</u>.

*Id.* at 102:21-103:1 (emphasis added).  But Damon Lee refuses to provide discovery as to what happened to the money that was sent to Kang's account.  This is critical discovery because Damon Lee contends that all of Prof. Lee's investment money was transferred to the U.S. and deposited into CGI's account.  Prof. Lee anticipates that this discovery, as to what happened to Jiae Lee's money after it was transferred to Kang, would disprove Damon Lee's contentions.

Any excuses by Damon Lee that he cannot provide this discovery rings hollow. Kang is clearly connected to Damon Lee and CGI. First, Damon Lee claims "[h]e's a friend of mine." Pollack Decl., Ex. 1 at 109:14-15. Second, somehow, Damon Lee has Kang's bank account number. *Id.* at 145:14-17 ("Q And in the paragraph below that, you identify Kang Shin Chul and his bank account number; correct? A Yes."). Third, Damon Lee submitted a claim for Kang in the CGI Bankruptcy Proceedings. *Id.,* Ex. 31, CGI Bankruptcy, Schedule F at 5 (showing nonpriority loan creditor claiming $472,353.68); Ex. 32, CGI Bankruptcy, Claimants from Plan, Exhibit A at 1 (listing Schedule F claim of $472,353.68).

That Damon Lee refuses to disclose any details about Kang or produce CGI documents showing the relationship between them is telling. The record shows Kang is at least a CGI debtholder. *Id.,* Ex. 1 at 111:22-112:12 ("[Q] So CGI owes a debt to Mr. Kang Shin Chul; correct? A Yes. Q And that's because Kang Shin Chul loaned money to CGI; is that right? A Yes.). But, incredulously, Damon Lee feigns ignorance as to any loan or investment agreement with this admitted debtholder. *Id.* (Q Is there an underlying loan agreement that exists with Kang Shin Chul and CGI? A I don't recall well. Q Is there an investment agreement between Kang Shin Chul and CGI? A I don't recall well.").

Thus, what is clear and unrebutted is Damon Lee instructed Jiae Lee to transfer 466 million KRW (at the time, approximately $422,000 USD) to Kang's Korean bank account. *Id.*, Ex. 1 at 102:21-103:1; *Id.*, Ex. 33, Korean criminal complaint at 3-5 (itemizing amounts); *Id.*, Ex. 12 at 178:13-23 (Damon Lee unable to confirm total amount transferred to Kang). The money trail stops there. *Id.,* Ex. 1, at 104:5-7 ("Q How did you get the money that went into the Kang Shin Chul and Nonga accounts? A I don't recall at the moment.").

Since Damon Lee refuses to provide any of the requested discovery on this topic, the only conclusion that can be drawn is that such discovery would prove that the money went to Kang but was never moved to the U.S., never reached CGI, and

was never used towards the CHLA project.  Instead, Damon Lee used Jiae Lee's investment money to pay off Kang.

Similarly, Damon Lee admits that he had Prof. Lee transfer money to the Korean bank account of a company called Nonga.  *Id*., Ex. 1 at 103:2-8 ("Q  Okay. And in the same way, you told Ms. Lee that she could send money to a company account called Nonga?  A  Yes, it's true that I told her to send the money to Nonga…."); *Id.,* Ex. 47 (email from Damon Lee to Prof. Lee, attaching a copy of the Nonga company's bankbook, showing Korean account number).  But Damon Lee refuses to provide discovery as to what happened thereafter to that money.  Again, this is critical discovery because it would disprove Damon Lee's contentions.

Incredulously, he claims not to recall how he (CGI) got the money that went into the Kang and Nonga accounts.  *Id*., Ex. 1 at 104:5-7 ("Q  How did you get the money that went into the Kang Shin Chul and Nonga accounts?  A  I don't recall at the moment.").  But this rings hollow.  Nonga is clearly connected to Damon Lee and CGI.  First, Damon Lee somehow possesses the Nonga company Korean bankbook. *See*, e.g., Pollack Decl., Ex. 47 (email from Damon Lee to Prof. Lee, attaching a copy of the Nonga company's bankbook); Ex. 33, Korean Criminal Complaint at 5. Second, Damon Lee held meetings at Nonga, to which he even invited Jiae Lee.  *Id.,* Ex. 34, 12/30/2016 text messages.

That Damon Lee has refused to disclose any details about Nonga or produce CGI documents that would show the relationship is telling.  In sworn testimony, Damon Lee even pretended not to know this company, going so far as to hint that Nonga instead may be related to his accomplice and co-defendant Grace Min.  *Id.,* Ex. 1 at 103:6-11 ("[A]  I told her to send the money to the company that Grace Min knows.  Q  Are you saying this company Nonga is a company related to Grace Min? A  I don't recall very well.").

But the record indicates that Damon Lee instructed Jiae Lee to transfer 42.5 Million KRW (then approximately $39,000 USD) to the Korean bank account of

-15-

Nonga.  *Id.* at 153:5-10 ("Q  And here you indicate splitting up the amount, you want the 20 million Korean won on the 20th and the remaining 42.5 million Korean won, you say you're going to give an account number for a company called Nonga; is that right?  A  Yes, it says like that."); Ex. 35, 12/27/2020 text messages.  Again, *the money trail stops there*.  Since Damon Lee refuses to provide any of the requested discovery on this topic, the only conclusion that can be drawn is that such discovery would prove that Prof. Lee's investment money was never transferred to the U.S. or to CGI, but rather Damon Lee used it for his own unrelated transaction with Nonga.

Damon Lee and CGI should be compelled to furnish the underlying details and produce the documents they allege substantiate their contentions.  If they do not, the only appropriate relief at this juncture of the case is an adverse inference and striking these contentions.  *Oculu,* 2015 WL 12720305 at *9

### C. Failure To Produce Documents Already Ordered By The Court

On October 2, 2020, the Court issued a discovery order in response to Prof. Lee seeking to compel Defendants to produce documents requested by Prof. Lee's RFPs 17, 18, and 37.  These RFPs seek franchise agreements and documents regarding, *inter alia*, Defendants' assets, wealth and financial condition.  Pollack Decl., Ex. 2, First RFPs to DL at 10, 13.  The Court agreed that these RFPs were relevant and that Defendants should produce responsive documents.  Dkt. 56, 9/29/2020 Hearing Tr. at 54:7-8, 54:19-23 ("I don't see these requests as being not relevant or overbroad" and "documents regarding Defendant's assets, wealth, so to speak, and with respect to the documents requesting the franchise agreements, those can be produced under some type of … attorneys-eyes-only protective order"), 58:5-7 ("THE COURT:  Well, I think with respect to 17, 18 and 37, I do think that <u>that's something that you should work in producing, Mr. Park</u>.") (emphasis added).

But Defendants failed to do so.  The Court approved an Amended Stipulated Protective Order on October 13, 2020 that provides for the designation of documents as "Highly Confidential – Attorneys' Eyes Only."  Dkt. 61.  This ensures Defendants'

sensitive information can be protected.  Nevertheless, Defendants still refuse to produce all documents responsive to RFP Nos. 17-18 and 37.  Pollack Decl., ¶ 26.

CGI has produced only five franchise agreements and only a small number of financial documents.  Damon Lee and CGI should be ordered to produce *all* documents responsive to RFP Nos. 17-18 and 37, including all franchise agreements to which they are a party in or out of the United States[7] and all documents that relate to their current assets, including cash, real estate, and stock or ownership interests.

### D. Failure to Produce Properly Prepared 30(b)(6) Witness

A company has an obligation to provide and prepare a witness capable of testifying on its behalf.  "Under Rule 30(b)(6), companies have a duty to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter."  *Hsingching Hsu v. Puma Biotech., Inc.,* No. 8:15–cv–00865–AG (SHK), 2018 WL 3078589 at *5 (C.D. Cal. June 20, 2018) (Kewalramani, J.) (citations, quotations omitted).  CGI failed to satisfy its Rule 30(b)(6) obligation.

Damon Lee's deposition revealed he was not prepared at all to testify as CGI's Rule 30(b)(6) designee.  He was unable to answer the most basic questions posed to him about CGI, as detailed above—information any prepared representative is expected to know and called for by the noticed deposition topics.  *See Supra,* Section II.A.

Damon Lee admitted that he did virtually nothing to prepare himself to testify. Pollack Decl., Ex. 12 at 11:8-10 ("[Q] What did you do to prepare to testify for these topics?  A  I thought a lot reading it last weekend.").  Damon Lee did not review any documents and did not speak to any current or former employees of CGI.  *Id.* at 11:14-18 ("Q  Did you speak with anyone regarding these topics?  A  No. "Q  So you didn't speak with any CGI employees?  A  Correct.").

---

[7] Damon Lee claims he has Coffee Bean franchises not just in the U.S., but overseas. Pollack Decl., Ex. 12, 10/13/2020 Depo. Tr. of D. Lee at 129:23-130:1, 130:14-17.

Defendants coupled their Rule 30(b)(6) violation by sandbagging Prof. Lee with last-minute productions on October 8 and 12, 2020 – literally the nights before the depositions of Damon Lee and CGI – despite having previously represented to the Court that their production was complete.  Pollack Decl., Ex. 13, 10/08/2020 email from D. Park to J. Pollack; Ex. 21, 10/12/2020 Email from D. Park to J. Pollack; Dkt. 59, 10/02/2020 Hearing Tr. at 79:19-25, 82:3, 82:15-83:5.  This left Prof. Lee unable to evaluate or use those documents for the deposition.

Damon Lee's and CGI's tactics are abusive and unreasonable given the tenor of this case.  They refused to produce any of CGI's Coffee Bean franchise agreements, and did so only *after* Damon Lee admitted at his deposition that they exist and CGI had them.  Pollack Decl., Ex. 12 at 38:4-18 ("Q  What Coffee Bean franchise agreements that are executed with CGI do you have a copy?  A  I have an agreement. Q  Okay.  So how many Coffee Bean franchise agreements do you have?  A  So you question is, are you asking me whether I have it or my company has it?  Q  How many Coffee Bean franchise agreements does CGI have?  A  Equity, Avalon, Jaju, Paramount, and Little Tokyo, five of them.  Q  All right.  And copies of these five franchise agreements are in CGI's files, correct?  A  Yes.  It's at CGI and it's written on that – that – that – by each location.").  The agreements were requested, and should have been produced, *before* Damon Lee and CGI's depositions took place, so that Prof. Lee's counsel could have had an opportunity to cover them at the depositions.

Damon Lee and CGI should be ordered to appear for a further deposition at their expense.  The Court compels Rule 30(b)(6) witnesses to appear for another deposition where, as here, the deponent engaged in "minimal preparation efforts," did not "review documents in order to prepare himself," and could not testify about facts that should have been within the scope of the corporate entity's knowledge.  *Montoya v. Orange Cty. Sheriff's Dept.,* No. SACV 11-1922-JGB (RNBx), 2013 WL 12347293, at *1-2 (C.D. Cal. Feb. 21, 2013) (Block, J.); *see also Cusack-Acocella v. Dual Diagnosis Treatment Ctr., Inc.*, No. 8:18-cv-01009-AG-KESx, 2019 WL

2621918, at *2-3 (C.D. Cal. Apr. 18, 2019) (Scott, J.) (ordering additional Rule 30(b)(6) deposition time due to unprepared deponent and late production).

### E.  Refusal to Produce Witness Joseph Paek for Deposition

Defendants cannot identify Joseph Paek as a witness, contend that he may be called at trial, and refuse to produce him for a deposition.  The Court prohibits such unfair surprise tactics.  *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.,* No. 2:16-cv-02322-AB (SKx), 2017 WL 11489792, at *6-7 (C.D. Cal. Nov. 15, 2017) (Birotte, J.) ("Plaintiff should not be permitted to call Mr. Rho to testify at trial.  Plaintiff failed to assist in arranging Mr. Rho's deposition and then made Mr. Rho seem completely dispensable, calling Defendant's request to depose him 'silly.'  To now call him as a trial witness would result in unfair surprise.") (citations omitted).  Damon Lee should produce Joseph Paek for deposition at his expense, or he should be excluded.

### F.  Refusal to Respond to Requests for Admission

Damon Lee and CGI did not respond to each propounded RFA.  Specifically, they did not deny each RFA.  Instead, they served an umbrella "objection" that they had no obligation to respond to the RFAs because they were not served more than 30 days prior to the October 26, 2020 fact discovery cut-off.  Pollack Decl., Ex. 27, at 2.  But under Fed. R. Civ. P. 36(a)(3), RFAs are self-executing, "meaning that a party admits a matter by failing to serve a response to the requests within thirty days."  *In re Pacific Thomas Corp.,* 715 Fed. Appx. 778, 779 (9th Cir. 2018).  Consequently, since Damon Lee and CGI have not denied any of the RFAs, they should be deemed admitted.  *Layton v. Intl. Ass'n of Machinists and Aerospace Workers,* 285 Fed. Appx. 340, 341 (9th Cir. 2008) (affirming same; "The district court did not err when it deemed facts admitted because of Layton's failure to timely respond to requests for admission.  There is no dispute that Layton did not respond on time; the facts were thus admitted without the need for any further action by the court[.]"); *see, e.g., Bd. of Trustees Cal. Ironworkers Field Pension Trust v. Harrison,* No. 2:18-cv-4365-CBM-

MRWx, 2019 WL 4565171, at *3 (C.D. Cal. Aug. 23, 2019) (Marshall, J.) (holding "Harrison failed to respond to Plaintiff's [RFAs] and thereby admitted [them].").[8]

## IV.   BUJA EQUITY SHOULD BE ORDERED TO PROVIDE DISCOVERY

### A.   Failure To Produce Documents

Buja Equity never objected to its subpoena.  It has thus waived all objections, and should be ordered to search for and produce all documents without objection.[9] *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992).

Buja Equity told the Court that it had no documents.  Pollack Decl., ¶ 43, Ex. 26 at 14:15, 15:1-5.  That is not credible considering that Defendants contend that Buja Equity is a legitimate company. *Id.,* ¶¶ 54-58.  There should be basic corporate records that evidence the company's legitimacy, including the same documents that CGI must produce, as set forth in Section III.A, *supra*.  Any legitimate business of this alleged scope would have them.  The lack of such documents and records would call into question the credibility of Defendants' entire position and story in this case.

For example, Defendants have now variously alleged that Buja Equity is an affiliated entity of CGI.  Pollack Decl., ¶¶ 54-58.  But Defendants have steadfastly avoided any discovery on this alleged corporate affiliation.[10]  This is a simple question.  Either Buja Equity is a CGI entity, or it is not.

---

[8] If Damon Lee and CGI did not want to answer the RFAs, they should have timely moved for a protective order.  *Wyles v. Sussman,* 445 F.Supp.3d 751, 757 (C.D. Cal. 2020) (Kim, J.) (quoting *Hadley v. U.S.,* 45 F.3d 1345, 1350 (9th Cir. 1995)).  They did not.  Instead, they waited 20 days after the fact discovery deadline to respond at all.  Pollack Decl., Ex. 17.

[9] On November 27, 2020, Buja Equity's counsel produced 26 pages of documents, claiming them to be a production by Buja Equity.  Pollack Decl., ¶ 34; Ex. 28.  They were just a reproduction of previously produced CGI documents.  *Id.*, ¶ 34.

[10] In fact, Damon Lee initially said that he did not know anything about the affiliation between Buja Equity and CGI.  Pollack Decl., Ex. 1, 10/09/2020 Depo. Tr. of D. Lee at 69:2-9 ("Q  Okay.  Does CGI own Buja Equity?  A  I don't know."), 74:5-8 ("Q BY MR. CHOUNG:  Is there a document that would show the corporate relationship, if any, between Buja Equity and CGI?  A  I don't know at the moment.").

This factual issue is critical to resolving Damon Lee's primary defense in this case.  If Buja Equity is the CHLA project entity, then Defendants failed to make Prof. Lee a 49% equity owner as called for under the Investment Agreement.  If it is not, Defendants cannot contend Buja Equity met their obligations under the Investment Agreement.  In either case, this discovery provides important evidence that Defendants intended to defraud Prof. Lee by putting the CHLA project into the hands of an unrelated entity, but which is owned and controlled by Damon Lee for his personal benefit.  Prof. Lee is entitled to this evidence.

There is a reason why Damon Lee has tried so hard to evade this discovery.  CGI was in pending bankruptcy proceedings from 2019 to 2020.  *In re Creative Global Investment Inc., et al.,* U.S. Bankruptcy Court for the Central District of California, Case No. 2:19-bk-13044-SK.  Yet, CGI failed to disclose Buja Equity, which means that either CGI lied to the Bankruptcy Court or Buja Equity is not a CGI entity and not the entity called for under the Investment Agreement.

Buja Equity also refuses to say or produce documents that would show if Prof. Lee has a 49% ownership or not.  Buja Equity's corporate witness claimed he did not know.  Pollack Decl., Ex. 14, 10/26/2020 Depo. Tr. of J. Lee at 200:7-10 ("Q  Sitting here today, you cannot testify that Jiae Lee has been granted a 49 percent interest in Buja Equity; correct?  A  I do not know."), 200:11-14 ("Q  And you don't know whether she's ever been granted any ownership interest in Buja Equity; correct?  A  I do not know."), 200:15-21 ("Q  You're not aware of any CHLA-Coffee Bean entity in which Jiae Lee has been granted a 49 percent interest; correct?  A  I do not know."). But this is a core issue in the case and called for by the deposition topics.  Jeffrey Lee should have been prepared to answer to these matters.

By withholding this evidence, Defendants have prejudiced Jiae Lee.  They should be ordered to produce this information and responsive documents.  If they do not, the only inference that can be drawn here is that the discovery sought would, in fact, demonstrate: (1) Defendants failed to make Jiae Lee a 49% equity owner in any

CGI CHLA entity as called for under the Investment Agreement; (2) Buja Equity is not the "CGI CHLA LLC" promised; and (3) Buja Equity was formed for the purpose of taking the CHLA project for Defendants' own benefit and to exclude Jiae Lee.

### B.      Failure To Produce Properly Prepared 30(B)(6) Witness

Like CGI, Buja Equity violated its Rule 30(b)(6) obligation to produce a prepared witness for deposition. *See Hsingching Hsu,* 2018 WL 3078589 at *5. Jeffrey Lee admitted that he did virtually nothing to prepare for his deposition as Buja Equity's corporate witness.  Jeffrey Lee could not answer the most basic questions about Buja Equity that a prepared corporate witness would have known about.  *See Supra*, Section II.B.  There is no dispute that Jeffrey Lee did not make an effort to prepare for his deposition, and he could not testify about facts that should have been within the scope of his knowledge as Buja Equity's corporate designee.  Moreover, Buja Equity failed to object to the deposition topics.  Thus, Jeffrey Lee and Buja Equity should be ordered to appear for a further deposition at their expense. *See Montoya*, 2013 WL 12347293, at *1-2; *Cusack-Acocella*, 2019 WL 2621918 at *2-3.

## V.      SANCTIONS FOR DISCOVERY MISCONDUCT

The discovery violations and abusive conduct described herein warrant sanctions under Rule 37 or the Court's inherent powers.  *See, e.g.*, *Richmark,* 959 F.2d at 1482  (affirming fine of $10,000 per day of noncompliance and $24,000 in attorneys' fees and costs); *Davis v. Fendler*, 650 F.2d 1154, 1160-61 (9th Cir. 1981) (upholding Rule 37(b) sanction of default judgment against party for "flouting of the obligations of the discovery provisions and of the district judge's authority"); *Freeman v. San Diego Ass'n of Relators*, 322 F.3d 1133, 1156–57 (9th Cir. 2003) (affirming costs as sanctions to bring a motion to compel against party that failed to produce documents in response to discovery requests).  Here, Prof. Lee respectfully requests the Court to order Damon Lee and CGI to pay her attorneys' fees and costs incurred as a result of having to file this motion.  She should never have had to file

this motion. Damon Lee and CGI have already failed to comply with prior discovery directives of this Court.  They simply have no excuse for their discovery conduct.

Prof. Lee also seeks sanctions for Defendants' failure to produce documents in a usable format.  Damon Lee and CGI purported to make productions in October 2020, but the files comprising these were not, and still are not, accessible.  Inexplicably, Defendants did not produce these documents in the industry standard 1-bit .tiff files with load files, and refused to do so despite Prof. Lee's repeated requests.  As a result, Prof. Lee's counsel has not been able to load or review these productions.  Pollack Decl., ¶ 35, Ex. 29.   A party's failure to produce readily usable or accessible documents in discovery requests warrants its own sanctions.  *See Rafael Town Center Investors, LLC v. The Weitz Company, LLC,* No. C 06-6633 SI, 2007 WL 2261376, at *1 (N.D. Cal. Aug. 6, 2007) ("[P]laintiff is entitled to some monetary sanctions arising out of defendant's document production . . . .[T]he first two productions were essentially unusable, and that as a result, plaintiff's law firm wasted a considerable amount of time[.]").  Damon Lee and CGI should be ordered to reproduce their October 2020 productions in a proper format and compensate Prof. Lee for the expense involved.  *See id*.[11]

## VI.   CONCLUSION

Based on the foregoing, Prof. Lee respectfully requests that Damon Lee, Jeffrey Lee, CGI, and Buja Equity be ordered to produce the requested information and documents, sit for further depositions, and compensate Prof. Lee for her attorney fees and costs incurred for their discovery violations.[12]

---

[11] Should the Court grant sanctions, Prof. Lee is prepared to separately submit an itemized calculation of her incurred fees and costs for the Court's approval.

[12] Defendants' discovery violations have had a very real prejudicial impact on Prof. Lee's expert's report.  Should any new discovery warrant supplementing the expert report, Prof. Lee intends to seek leave of the Court since deadlines have passed.

1    Dated:  December 21, 2020                By: */s/ Joshua J. Pollack*

2                                             LATHROP GPM LLP
3                                             Andrew Y. Choung
                                              Erica J. Van Loon
4                                             Joshua J. Pollack

5                                             *Attorneys for Plaintiff and*
6                                             *Counterclaim Defendant Jiae Lee and*
                                              *Consolidated Defendants Song-Gu*
7                                             *Hong and Eun-Jeong Hwang*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28